# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

## Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-CV-23272-GRAHAM/Goodman

SONIA DELGADO, JUAN ENRIQUE
DELGADO and JACQUELINE CABRERA,
as Co-Personal Representatives of the Estate
of Juan Delgado, Deceased,

        Plaintiffs,

vs.

DELTA AIR LINES, INC.,

        Defendant.

_____/

## DECLARATION OF SONIA DELGADO

1.      My name is Sonia Delgado.  I am over 21 years of age and am legally competent and expressly qualified to author this Declaration.  I have personal knowledge of each fact contained in this Declaration.

2.      My husband, Juan Delgado, and I were married for 53 years at the time of his death.

3.      During our marriage, my husband and I frequently traveled on airplanes together, including international trips.

4.      In all the times that we traveled, together and separate, neither I nor my husband, Juan Delgado, had to disembark a 747-400, or any other large airplane, using portable stairs.

5.      In the past when we traveled to Paris, together and separate, neither I nor my husband, Juan Delgado, had to disembark any plane using portable stairs.

6.      Our flight, which originated in Miami, was late in arriving to Charles de Gaulle Airport.

7.      Our flight was supposed to land in Paris at 8:25 am. It was late in arrival, however. I believe it was 20–30 minutes late in arriving.

8.      Before we walked out of the aircraft door, there was no indication that we would disembark using portable stairs instead of a ramp or jetway.  There was no announcement made or warning issued to advise the passengers that stairs would be used.

9.      Upon arrival, the passengers of the flight began descending the stairs in a very rushed manner.

10.      During disembarkation, passengers were bumping into one another.  I was personally bumped by at least one other passenger.  I was also passed by other passengers while I was on the stairs.

11.      Because of the rushing of passengers, it was virtually impossible that my husband was not bumped or pushed by another passenger on the small portable staircase.  There were passengers on the stairs both in front and behind my husband, including the people who had previously cut me off during the disembarkation.

12.      I was standing approximately two stairs behind my husband when I witnessed that he had fallen.  My husband fell backwards, with his feet extending out in front of him and his head falling back toward the stair case.

13.      I was just past the intermediate platform at the time my husband fell, and I believe that the witness statement that he was on the eleventh step from the bottom of the stairs accurately reflected his position on the stairs when his fall initiated.  He then rolled down the stairs to the tarmac.

stairs accurately reflected his position on the stairs when his fall initiated.  He then rolled down the stairs to the tarmac.

15.     During our 53 year marriage, it was my husband's habit to traverse any stairs he was on at a safe rate of speed, while holding onto the handrail, and to be extra cautious when descending stairs.

16.     My husband was a very active individual which allowed him to remain limber and steady in his older age.

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

DATED this _9th_ day of _July_, 2013.

_Sonia Delgado_
**SONIA DELGADO**

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

# Exhibit B

| GENDARMERIE NATIONALE | | | | | |
|---|---|---|---|---|---|
| GENDARMERIE DES TRANSPORTS AÉRIENS | | | | ENQUÊTE DE FLAGRANCE | |
| SECTION DE RECHERCHES | | | | **PROCÈS-VERBAL DE TRANSPORT CONSTATATIONS ET MESURES PRISES** | |
| Code unité | Nmr P.V. | Année | Nmr dossier justice | Nmr pièce | N° feuillat |
| 15855 | 231 | 2012 | | 2 | 1 / 7 |

Le vendredi 01 juin 2012 à 11 heures 10 minutes.
Nous soussigné Adjudant SELLIER Olivier, Technicien en Identification Criminelle, Officier de Police Judiciaire de la Section de Recherches de la Gendarmerie des Transports Aériens, en résidence à Roissy aéroport CDG
Vu les articles 16 à 19 et 53 à 67 du Code de Procédure Pénale.
Nous trouvant au bureau de notre unité à TREMBLAY EN FRANCE 93290, rapportons les opérations suivantes :

**SAISINE**

le jeudi 31 mai 2012 à 09 heures 30, le lieutenant-colonel SERVETTAZ commandant de notre unité nous informe qu'un accident s'est produit à l'arrivée d'un vol de la compagnie aérienne AIR FRANCE en provenance de Miami, Un passager aurait fait une chute d'une passerelle et son pronostic vital est très engagé.

Les faits se sont déroulés au point de stationnement avion H12 territoire de la commune de Le Mesnil Amelot (77), compétence du Tribunal de Grande Instance de Bobigny (93).

Notre retour de Melun (77) et notre concours sont sollicités pour assurer les constatations in-situ. Au cours de nos constatations, nous sommes assistés du gendarme SCHOESER Richard, Agent de Police Judiciaire, Technicien en Identification Criminelle de notre unité.

**SITUATION A L'ARRIVÉE DES ENQUÊTEURS**

Nous arrivons sur les lieux le 31 mai 2012 à 10 heures 50 minutes, accompagnés du Lieutenant-Colonel SERVETTAZ, commandant notre unité, du Chef d'Escadron VALOIS, commandant en second et des personnels du groupe criminalité organisée de notre unité (ADC LANFUMEY, Adjudants VILLESSOT, DELMAS, CHAILLOUX et FLAHAUT.

Sont également présents :

--- Les personnels de la Police Aux Frontières (Identité Judiciaire, U.J.V.P, police générale)

--- Les représentants et témoins de la compagnie aérienne AIR FRANCE (Escale, infrastructures, maintenance.

— Madame Kostomaroff, procureur adjoint à Bobigny (93) se transporte sur les lieux et confirme notre saisine, pour des faits de blessures involontaires.

Dès notre arrivée sur les lieux, nous constatons que les fonctionnaires de la police aux frontières ont établi un gel des lieux et que les personnels de l'Identité Judiciaire ont figé les lieux à l'aide de clichés photographiques. Notre interlocuteur CHAPUIS Fabrice nous informe qu'il mettra à notre disposition l'ensemble de ses photographies pour la poursuite de l'enquête.

– aucune modification volontaire des lieux n'a été effectuée, La victime a été prise en charge par les secours et la passerelle est restée en place.

**MESURES PRISES**

– A notre earrivée, les premières mesures ont été prises. Nous informons en direct notre commandant d'unité des constatations effectuées.

– Nous n'effectuons pas de compte rendu au parquet de Bobigny, madame la procureure se déplaçant sur les lieux.

– La gestion des témoins est prise en charge par l'adjudant VILLESSOT Eric de notre unité, désigné Directeur d' Enquête.

**L'Officier de Police Judiciaire**

### ETAT DES LIEUX

L'aéroport de Paris-Charles-de-Gaulle, communément appelé « **Roissy-Charles-de-Gaulle** », est un aéroport francilien situé à vingt-trois kilomètres au nord-est de Paris.

### LE PARKING H.12

Le point de parking « H.12 » où s'est produit l'accident se trouve au terminal 2 de la zone réservée ( zone non librement accessible au public). Il se situe dans une zone appelée « aire éloignées », ce qui veux dire que l'avion n'est pas au contact d'une aérogare et que de ce fait, les passagers sont débarqués ou embarqués des aéronefs par des passerelles mobiles spécifiques à l'aéronautique. Ensuite, ils sont acheminés vers les aérogares par bus. Sur le poteau en béton indiquant aux pilotes le numéro de parking, nous constatons la présence de deux caméras susceptibles d'orienter nos recherches.

 

Poteau avec caméras et indicateur de parking      Point de parking avion indiqué au sol

 

Avion correctement placé sur sa ligne et calé, ainsi que position de la passerelle emprunté par la victime monsieur DELGADO.

**L'Officier de Police Judiciaire**

**L'AERONEF**

Il s'agit 'un aéronef de marque BOEING, type 747-400 exploité par la compagnie aérienne AIR FRANCE. Il est immatriculé F-GITE. L'appareil est en provenance de MIAMI (U.S.A) et est arrivé en retard à Roissy. Cet appareil est parfaitement placé à son parking et il est normalement « calé », ce qui exclu tout mouvement de l'avion au moment du débarquement des passagers. Monsieur DELGADO et sa famille ont voyagé en classe économique située au pont inférieur.



Pont supérieur et première partie du pont inférieur l'avion réservés aux passagers « première » et « business »

Passagers « classe économique »

**CORPS DU DELIT**
**PASSERELLE**

La passerelle utilisée porte le numéro de parc S 628. Elle est la propriété de la compagnie aérienne AIR FRANCE et porte la plaque inventaire AF 3750 00 6628. Dès notre arrivée, nous sollicitons de monsieur PAPIN Gilles, responsable matériel AIR FRANCE, présent sur les lieux, l'obtention des documents relatifs à l'entretien de cet escalier mobile (ou passerelle). Ce document nous est remis au cours de nos constatation et il est joint au présent. Nos constatations permettent d'établir que la passerelle possède 25 marches, un palier intermédiaire, ainsi qu'un marche amovible se trouvant a bas de l'escalier. Il s'agit d'une passerelle (ou escalier mobile) couverte et posée sur verrins lorsqu'elle se trouve en position d'utilisation. A notre arrivée, les verrins sont en place. La passerelle est positionnée sur la porte « S » de l'aéronef et elle n'a pas été manipulée.

**L'Officier de Police Judiciaire**

Case 1:12-cv-23272-DLG   Document 43-1   Entered on FLSD Docket 07/15/2013   Page 9 of 68



Passerelle positionnée sur l'appareil



Vue générale de la passerelle couverte avec N° de parc S628





Passerelle en place, ainsi que les 4 verrins

**L'Officier de Police Judiciaire**

Les différentes investigations, ainsi que les clichés réalisés permettent de démontrer que la pente est importante lorsque l'on accède à la passerelle depuis l'avion. Cette sensation est également perceptible depuis le bas de l'escalier amovible.

 

Poursuivant nos investigations, nous constatons que sur la marche N° 8 en partant du bas (indice 3) il manque la totalité de la bande antidérapante soit 143 cm. Cette absence de bande n'altère en rien l'état de la marche en condition météorologiques sèche (ce qui est le cas). Aucune boursouflure ou creux n'est décelable.

L'indice N° 4 correspondant à la marche N° 11 sur laquelle nous constatons l'absence d'une longueur de 58 cm de bande antidérapante. Au niveau de la coupure, il n'y a pas d'ergot susceptible d'entraîner une chute. Toutefois, sans être précis, le témoin (mademoiselle COSTENTIN) indique que cette marche se trouve à proximité de l'endroit où monsieur DELGADO à chuté.

L'étude de l'ensemble des marches ne permet pas de découvrir la moindre substance humide, grasse ou encombrante pouvant entraîner une glissade ou une perte d'équilibre. Les rambarde sur les cotés sont également présentes et en bon état. Précisons que d'après les témoins, monsieur DELGADO avait déjà perdu l'équilibre avant d'arriver à la marche objet de notre indice 3.

**L'Officier de Police Judiciaire**

Case 1:12-cv-23272-DLG   Document 43-1   Entered on FLSD Docket 07/15/2013   Page 11 of 68







### POINT DE CHOC PRESUME

Le point de choc présumé du crâne de la victime se trouve immédiatement au pied de la passerelle. Aucun élément biologique (sauf deux traces de sang objets des indices 1 et 2) n'est découvert. Le sol en béton ne présente aucun élément particulier. La proximité de la passerelle, laisse supposer que la victime est tombée sans rebondir et ne semble pas avoir été manipulée avant l'arrivée des secours. Sur place, reste des restes de trousses de secours et des couvertures utilisées pour porter secours à la victime. Ces éléments sont laissés à la disposition de la compagnie aérienne AIR FRANCE.

**L'Officier de Police Judiciaire**

Case 1:12-cv-23272-DLG   Document 43-1   Entered on FLSD Docket 07/15/2013   Page 12 of 68

ORIGINAL






**MESURES DIVERSES**

     –      La passerelle fait l'objet d'un procès-verbal distinct de saisie (scellé N° 1)

     –      Nous sollicitons l'obtention d'un dossier de caractéristiques techniques de l'escalier passagers automoteur ABS580 (passerelle),

     - La victime a été transportée à l'hôpital de la Salpetrière à Paris, avant son transfert vers le centre hospitalier Robert Ballanger à Aulnay sous bois (93).

     –      Les proches de la victime ont été pris en charge par la compagnie aérienne AIR FRANCE et acheminés vers le centre hospitalier d'Aulnay-sous-bois.

Nos constatations prennent fin le 31 mai 2012 à 12 heures 50 minutes

Fait et clos a TREMBLAY EN FRANCE (93) le  01 juin 2012 à 13 H 00

**L'Officier de Police Judiciaire**

| Instruction Technique Matériel d'escale ITM 1004 | **AIR FRANCE** |
|---|---|
| Escalier passager autotracté ABS 580-3 | |
| **DE-EK / BT** | DIRECTION GENERALE EXPLOITATION |

ORIGINAL

## OPERATIONS DE VISITES
### VISITE V1 (1200h ou 64 semaines)

Feuille 1/3

**DATE :** 30/03/12     **NOM DE L'AGENT :** CHAUDIARD     **N°OT :** 593646

**N° INVENTAIRE (10 chiffres) :** 3750-00-6628     **HORAMETRE :** 3270

| Rep | Désignation des opérations de visite (Spécifications) | FAIT | NON FAIT | OBSERVATIONS |
|---|---|---|---|---|
| 1 | Lavage complet du véhicule : **Voir FA 1004-12.** | | | |
| 2 | Exécuter un essai fonctionnel servant de contrôle d'entrée. | ✗ | | |
| | **MOTEUR :** | | | |
| 3 | Visite moteur Peugeot XUD9Ai suivant **ITM 1024**<br>Visite moteur Perkins 104-22 suivant **ITM 1464**<br>Visite moteur Perkins 404C-22 suivant **ITM 1516** | ✗ | | |
| | **BOITE DE VITESSES :** | | | |
| 4 | Vidange de l'huile de boite de vitesse : **ElfmaticG3** | | | |
| 5 | Sur BV ZF ou THM 180 : Echanger la crépine d'aspiration de boite de vitesse. | ✗ | | |
| 6 | Sur BV Graziano : Echange du filtre de boite. | | | |
| | **CHASSIS :** | | | |
| 7 | Contrôler le niveau d'électrolyte de la batterie : **Eau distillée** | | ✗ | |
| 8 | Contrôler le niveau de liquide de freinage et l'état du circuit de freinage | ✗ | | |
| 9 | Graisser les points munis de graisseurs : **Graisse Epexelf 2**<br>**Voir FA-1004-02** | ✗ | | |
| 10 | Graisser les tringleries et huiler les câbles de cde de frein de parc. | ✗ | | |
| 11 | Nettoyer et graisser la crémaillère | ✗ | | |
| 12 | Vérifier le serrage des vis de fixation. | ✗ | | |
| 13 | Contrôle et réglage des garnitures des freins AR : **FA 1004-01** | ✗ | | |
| 14 | Contrôler le niveau de liquide de freinage : **Bendix L4680 65200**<br>En DOT 4 : Remplacement impératif tous les 2 ans | ✗ | | |
| 15 | Essieu avant : Contrôler les plaquettes et les disques de freins et remplacement si nécessaire. | ✗ | | |
| 16 | Pont arrière : Contrôler les mâchoires et les tambours de freins et les remplacer si nécessaire. | ✗ | | |
| 17 | Remplacer l'huile de pont AR : **Tranself EP 80W90** | ✗ | | |
| 18 | Vérifier le serrage des vis de fixation des étriers de frein.<br>Resserrer et monter avec de la loctite : **Loctite 2701 - Activateur 7471** | ✗ | | |
| 19 | Contrôler le serrage des vis du croisillon de herse : 20 m/DaN.<br>Remplacement de la boulonnerie si nécessaire.<br>Remplacement des rondelles si celle-ci sont incurvées.<br>Vis HM 16x50 8.8 /Ecrou Nylstop HM 16 8.8 / Rondelle LL16 | ✗ | | |
| | **BARRIERE ECLUSE :** | | | |
| 20 | Vérifier la bonne manipulation de la barrière. (Plate-forme horizontale : Aide au démarrage, le reste de la montée doit se faire aisément). | ✗ | | |
| 21 | Vérifier le système et le fonctionnement du verrouillage de la barrière (position haute / position basse). | ✗ | | |

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)
Page T. K.E-01

| Instruction Technique Matériel d'escale ITM I004 | **AIR FRANCE** |
|---|---|
| Escalier passager autotracté **ABS 580-3** | |
| **DE-EK / BT** | **DIRECTION GENERALE EXPLOITATION** |



## OPERATIONS DE VISITES
### VISITE V1 (1200h ou 64 semaines)

ORIGINAL

Feuille 2/3

| **DATE :** | **NOM DE L'AGENT:** | **N°OT :** |
|---|---|---|
| **N° INVENTAIRE (10 chiffres) :** | | **HORAMETRE :** |

| Rep | Désignation des opérations de visite (Spécifications) | FAIT | NON FAIT | OBSERVATIONS |
|---|---|---|---|---|
| | **MARCHE RELEVABLE :** | | | |
| 22 | Vérifier la bonne manipulation de marche. | ✗ | | |
| 23 | Vérifier l'état des butées. Changement si nécessaire. | ✗ | | |
| 24 | Vérifier le système et le fonctionnement du verrouillage de la marche. (position haute). | ✗ | | |
| | **HYDRAULIQUE :** | | | |
| 25 | Vidanger l'huile hydraulique (ou recycler) puis remplir : **Hydrelf 46** Contenance du réservoir 80 L. | ✗ | | |
| 26 | Nettoyer le filtre reniflard. | ✗ | | |
| 27 | Contrôler l'état des vérins. | ✗ | | |
| 28 | Echange du filtre de retour d'huile hydraulique. | ✗ | | |
| 29 | Si équipé : Contrôler le filtre dessicant (Cartouche rose = changement) | ✗ | | |
| | **ELECTRICITE :** | | | |
| 30 | Contrôle des servitudes électriques : feux de signalisations, câblage divers,ainsi que l'efficacité de l'arrêt d'urgence, cellules d'éclairage volées | ✗ | | |
| 31 | Contrôler la tension de charge du circuit électrique. | ✗ | | |
| | **CANOPY / VOLEE :** | | | |
| 32 | Vérifier l'état et le fonctionnement du canopy ainsi que le soufflet. | ✗ | | |
| 33 | Vérifier le bon fonctionnement des électro-aimants de sécurité de herse. Remplacement si nécessaire | ✗ | | |
| 34 | Vérifier le débattement libre des 02 rambardes coulissantes et l'absence de corps étrangers dans le chemin de roulement. Remplacement des élastiques de chaque côté des rambardes. Contrôler le retour automatique de ces rambardes. | ✗ | | |
| 35 | Contrôler l'état du seuil avant de plate-forme. Il ne doit en aucun cas être déformé à ces extrémités. | ✗ | | |
| 36 | Contrôler le bon fonctionnement du bec oscillant situé sous la plate-forme ainsi que l'état des patins de glissement. Le bec oscillant doit coulisser librement et ne pas rester en position rétractée. | ✗ | | |
| 37 | Contrôler la présence et l'état de la bande antidérapante située sur l'extrémité des marches | ✗ | | |
| | **GENERAL :** | | | |
| 38 | Contrôle de la présence des bandes réfléchissante, logos AF et N° | ✗ | | |
| 39 | Vérifier l'état et la pression des pneumatiques : **8 bars** | ✗ | | |
| 40 | Vérifier le torquage des 4 roues : **32 m/kg** | ✗ | | |
| 41 | S'assurer de la fermeture des capots avec les serrures à empreintes carrées, remplacement si nécessaire. | ✗ | | |
| 42 | Vérifier la présence des étiquettes carburant fuel ou gas-oil, remplacement si nécessaire. ( PAG- K- 2.4 DEBT 17 ) | ✗ | | |

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)

Edition 02 Rev 07

Instruction Technique Matériel d'escale ITM 1004
Escalier passager autotracté ABS 580-3
**DE-EK / BT**

**AIR FRANCE**

DIRECTION GENERALE EXPLOITATION

## OPERATIONS DE VISITES
### VISITE V1 (1200h ou 64 semaines)

ORIGINAL

Feuille 3/3

| DATE : | NOM DE L'AGENT: | N°OT : |
|---|---|---|
| N° INVENTAIRE (10 chiffres) : | | HORAMETRE : |

| Rep | Désignation des opérations de visite (Spécifications) | FAIT | NON FAIT | OBSERVATIONS |
|---|---|---|---|---|

EFFECTUER LES ESSAIS FONCTIONNELS DE FIN DE VISITE

**REMPLIR LE CARNET DE CRMT DE MANIERE PRECISE**

Ces informations sont importantes, elles sont traitées sur informatique afin d'affiner la politique d'entretien qui vous est proposée.

**TRAVAUX SUPPLEMENTAIRES OU EN SUSPEND :**

**VISA AGENT :**



En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)

Page **T. K.E-03**

| Instruction Technique Matériel d'Escale ITM 1004 | **AIR FRANCE** |
|---|---|
| Escalier passager ABS 580 | |
| DE.BT | **DIRECTION GENERALE EXPLOITATION** |

## ESSAIS FONCTIONNELS

**CONTROLES STATIQUES**

> **CES ESSAIS PERMETTANT D'EVALUER L'ETAT DE LA MACHINE SONT A EFFECTUER A CHAQUE VISITE D'ENTRETIEN PERIODIQUE EN ENTREE / SORTIE**

A) LIRE LE CRMT ET NOTER S'IL EXISTE DES OBSERVATIONS UTILES POUR LA PROCHAINE VISITE.
B) ETABLIR UNE DEMANDE D'INTERVENTION POUR TOUTE ANOMALIE RENCONTREE.

N° Inventaire : 628   Potentiel : 3270   DATE : 30/03/12   Fait par : CLAUDI'ARD

| Contrôles CONTROLES STATIQUES | Observations | Entrée OK | Entrée NC | Sortie OK | Sortie NC |
|---|---|---|---|---|---|
| **1-CHASSIS** | | | | | |
| Contrôler: | | | | | |
| -L'état général du châssis + peinture | | X | | X | |
| -L'état des différents vérins | | X | | X | |
| - L'état des pneumatiques roues AR et AV | | X | | X | |
| -Présence et état des jauges de gabarit | | X | | X | |
| -Présence et état du **T** de positionnement | | X | | X | |
| -L'état des étiquettes image de marque et des étiquettes de sécurités | | X | | X | |
| Vérifier l'intégrité de l'affichette codes pannes (remplacement si nécessaire) | | X | | X | |
| -Contrôle des niveaux (Moteur, BV, Liquide de refroidissement et de frein, hydraulique…) | | X | | X | |
| **2-VOLEE-PLATE-FORME** | | | | | |
| Contrôler: | | | | | |
| - Etat général des 2 volées, de la main courante et des marches | | X | | X | |
| - Le bon positionnement de la volée supérieur sur les sécurités | | X | | X | |
| -L'état et le fonctionnement des rambardes coulissantes sur la plate forme | | X | | X | |
| - Le bon fonctionnement du bec oscillant et l'état des patins Téflon. | | X | | X | |
| - L'état et le fonctionnement du soufflet de plate-forme. | | X | | X | |
| - L'état général (chocs, déformations, etc. …) et le fonctionnement de la barrière écluse. | | X | | X | |
| - L'état général (chocs, déformations, etc. …) et le fonctionnement de la marche relevable. | | X | | X | |
| - L'état et la présence de l'inclinomètre. | | X | | X | |
| -L'état de l'éclairage volée | | | X | X | |

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)

Instruction Technique Matériel d'Escale **ITM 1004**

**Escalier passager ABS 580**

**DE.BT**

**AIR FRANCE**

**DIRECTION GENERALE EXPLOITATION**

| Contrôles | Observations | Entrée | | Sortie | |
|---|---|---|---|---|---|
| CONTROLES STATIQUES | | OK | NC | OK | NC |
| | | | | | |
| **3-POSTE DE CONDUITE** | | | | | |
| Contrôler: | | | | | |
| -Présence et état des panneaux signalétique | | ✗ | | ✗ | |
| -Présence et état des 3 rétroviseurs | | ✗ | | ✗ | |
| -Présence du levier de pompe à main | | ✗ | | ✗ | |
| | | | | | |
| **4- ELECTRIQUE** | | | | | |
| Contrôler: | | | | | |
| - Les voyants et indicateurs. | | ✗ | | ✗ | |
| - L'éclairage et la signalisation. | | ✗ | | ✗ | |
| -Servitudes électriques (feux, phares travail, coupe batterie, gyrophare, Arrêts d'urgence, avertisseur marche arrière si équipé) | | | ✗ | ✗ | |
| | | | | | |
| **5-GEOLOCALISATION** | | | | | |
| Contrôle du système de géolocalisation : -Mettre la machine en marche et vérifier sur l'application si le positionnement ainsi que l'activation sont corrects( couleur jaune ) | | ✗ | | ✗ | |

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)

Page **T. J-02**

| Instruction Technique Matériel d'Escale ITM 1004 | | **AIR FRANCE** |
|---|---|---|
| Escalier passager ABS 580 | | |
| DE.BT | | **DIRECTION GENERALE EXPLOITATION** |

## ESSAIS FONCTIONNELS

Contrôles dynamiques

| CES ESSAIS PERMETTANT D'EVALUER L'ETAT DE LA MACHINE SONT A EFFECTUER A CHAQUE VISITE D'ENTRETIEN PERIODIQUE EN ENTREE / SORTIE |
|---|

**A) LIRE LE CRMT ET NOTER S'IL EXISTE DES OBSERVATIONS UTILES POUR LA PROCHAINE VISITE.**
**B) ETABLIR UNE DEMANDE D'INTERVENTION POUR TOUTE ANOMALIE RENCONTREE.**

N° Inventaire : _628_   Potentiel : _3270_   DATE : _30/03/12_   Fait par : _GAUDIARD_

| Contrôles | Observations | Entrée | | Sortie | |
|---|---|---|---|---|---|
| CONTROLES DYNAMIQUES | | OK | NC | OK | NC |
| | | | | | |
| **1-Essais du véhicule :** | | | | | |
| Contrôler: | | | | | |
| - Essais roulage marche Av et Ar( en marche Ar vérifier le déclenchement du buzzer) | | | X | ✓ | |
| -Le bon fonctionnement de la direction | | ✗ | | ✗ | |
| -Essais des freins de service et de parc | | ✗ | | ✗ | |
| -A compter du n°3750.05.6676 contrôler le passage en petite vitesse si la volée est déployée | | ✗ | | ✗ | |
| -Essais des manœuvres de secours | | ✓ | | ✗ | |
| | | | | | |
| | | | | | |
| **2-stabilisation :** | | | | | |
| Contrôler: | | | | | |
| -L'allumage du voyant rouge « béquilles sorties » (engin stabilisé) | | ✗ | | ✗ | |
| -L'allumage du voyant vert « béquilles rentrées » | | ✓ | | ✗ | |
| L'allumage des feux à éclats plate forme dès que l'on déstabilise l'engin | | ✗ | | ✓ | |
| | | | | | |
| **3-Vérifier les impossibilités suivantes :** | | | | | |
| -De démarrer si la marche AV ou AR est enclenchée | | ✗ | | ✗ | |
| -De rouler si le voyant vert béquilles rentrées est éteint | | ✗ | | ✓ | |
| -De rouler en marche arrière si la marche relevable est baissée | | ✗ | | ✗ | |
| | | | | | |

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)
Page **T. J-03**

| Instruction Technique Matériel d'Escale PTM 1604 | **AIR FRANCE** |
|---|---|
| Escalier passager ABS 580 | |
| DE.BT | **DIRECTION GENERALE EXPLOITATION** |

| Contrôles | Observations | Entrée | | Sortie* | |
|---|---|---|---|---|---|
| **CONTROLES DYNAMIQUES** | | OK | NC | OK | NC |
| **4-Lazer-Radar d'approche:** | | | | | |
| -Vérifier le bon fonctionnement ainsi que le bon positionnement du laser | | ✗ | | ✗ | |
| -Vérifier le bon fonctionnement du radar d'approche | | ✗ | | ✗ | |
| **5-Safety shoes:** | | | | | |
| -Vérifier le bon fonctionnement du safety shoes malgré le coupe batterie fermé+ le contact coupé (sirène + feu à éclats) | | ✗ | | ✗ | |
| **6-Clef à puce :** | | | | | |
| Fonctionnement clef à puce : Aucun déplacement possible de l'escalier si pas de CP. | | ✗ | | ✗ | |
| Contrôle du paramétrage de la serrure ainsi que l'injection des clefs interdites. | FA 1437-14 | ✗ | | ✗ | |

**\* Il est impératif de faire un essai fonctionnel de sortie si l'agent est intervenu sur l'item de contrôle cite. Dans le cas contraire, l'essai d'entrée est suffisant.**

---

| ⚠ | **APRES ESSAIS FONCTIONNELS ET AVANT MISE A DISPOSITION AUX UTILISATEURS LISTER CI-DESSOUS LES IMPASSES EVENTUELLES** | ⚠ |
|---|---|---|

**ACCEPTATION PAR LA HIERARCHIE POUR MISE EN SERVICE**    OUI / NON     VISA :

En cas d'impression et/ou photocopie, le suivi documentaire n'est plus assuré et vous engagez votre responsabilité.
Avant toute utilisation, vérifiez la conformité avec le document de référence sur le site DE.BT (sous Lotus Notes)
Page **T. J-04**

| **GENDARMERIE NATIONALE** | | | | INVESTIGATIVE INQUIRY | | |
|---|---|---|---|---|---|---|
| AERIAL TRANSPORTATION POLICE | | | | [Stamp - ORIGINAL] | | |
| | | | | REPORT OF TRANSPORTATION | | |
| RESEARCH DIVISION | | | | FINDINGS AND MEASURES TAKEN | | |
| Unit Code | Report No. | Year | Court File No | | Document No. | Sheet No |
| 15855 | 231 | 2012 | | | 2 | 1 / 7 |

On Friday June 1, 2012 at 11:10 am.

We, the undersigned Warrant Officer SELLIER, Olivier, Criminal Identification Technician, Judicial Police Officer in the Research Division of the Aerial Transportation Police in residence at Roissy CDG Airport

In view of Articles 16 to 19 and 53 to 67 of the Code of Criminal Procedure.

We, at our unit office at TREMBLAY EN FRANCE 93290, report the following operations:

### REFERRAL

On Thursday, May 31, 2012 at 9:30 am, Lieutenant Colonel SERVETTAZ, our unit commander, informed us that an accident occurred upon the arrival of an AIR FRANCE flight from Miami. A passenger fell from a gateway and his prognosis is very delicate.

The incident occurred in the airplane parking spot H12 in the territory of the Commune of Le Mesnil Amelot (77), in the jurisdiction of the Tribunal de Grande Instance [Higher Court] of Bobigny (93).

Our return from Melun (77) and our assistance requested to confirm the findings onsite. During our investigation, we were assisted by Constable Richard SCHOESER, Judicial Police Officer, Criminal Identification Technician of our unit.

### SITUATION UPON THE ARRIVAL OF THE INVESTIGATORS

We arrived on the scene on May 31, 2012 at 10:50 am, accompanied by Lieutenant Colonel SERVETTAZ, our unit commander, Squadron Leader Valois, second in command and staff from the organized crime group of our unit (ADC LANFUMEY, Warrant Officers VILLESSOT, DELMAS, CHAILLOUX and FLAHAUT.

Also present:

--- Police personnel from the Border Police (Judicial Identity, UJVP, General Police)

--- Representatives and witnesses from the airline AIR FRANCE (Stopovers, Infrastructure, Maintenance.

--- Mrs. Kostomaroff, Deputy Prosecutor for Bobigny (93) came on the scene and confirmed our referral, for unintentional injuries.

Upon our arrival on the scene, we found that the police officers from the Border Police had secured the premises and that personnel from the Judiciary Identity had made a record of the crime scene using photographic imagery. Our contact person Fabrice CHAPUIS informed us that he would put all of his photographs at our disposal to continue the investigation.

- No voluntary changes have been made to the premises. Emergency personnel cared for the victim and the stairway has remained in place.

### MEASURES TAKEN

- Upon our arrival, the first measures were taken. We directly informed our unit commander of the findings.

- We did not make a report to the Prosecutor for Bobigny, as the Prosecutor was visiting the premises.

- Witness management was carried out by Warrant Officer Eric VILLESSOT of our unit, appointed Director of the Investigation.

**The Judicial Police Officer**
[Signature]

[Signature]

Report No. 15855/00231/2012          Document No.          Sheet No. 2 / 7

## CONDITION OF THE PREMISES

The Paris-Charles de Gaulle Airport, commonly called **"Roissy-Charles-de-Gaulle"**, is an airport located in the Ile de France twenty-three kilometers north-east of Paris.

[Stamp - ORIGINAL]

### PARKING SPACE H.12

The parking space "H.12" where the accident occurred is found at Terminal 2 of the reserved area (area not freely accessible to the public). It is located in an area called "remote area", which means that the aircraft is not in contact with an air terminal and the passengers are therefore offloaded or embarked on aircraft by special mobile aeronautic gateways. They are then transferred to the terminal by bus. On the concrete pole indicating the parking spot number to pilots, we note the presence of two cameras to guide our search.



Lamppost with cameras and ground parking indicator



Airliner parking space shown on ground



Airliner correctly placed on its line and chocked, and position of the gateway used by the victim Mr. DELGADO.

### The Judicial Police Officer

[Signature]

Report No. 15855/00231/2012          Document No.                    Sheet No. 3 / 7

[Stamp - ORIGINAL]

**THE AIRCRAFT**

It is a BOEING brand aircraft, type 747-400 operated by the AIR FRANCE airline. It is registered F-GITE. The aircraft was coming from MIAMI (USA) and arrived late at Roissy. This aircraft is perfectly placed in its parking space and it is normally "chocked", which rules out any movement of the aircraft at the time the passengers were disembarking. Mr. Delgado and his family traveled in economy class located on the lower deck.



Upper deck and first part of the lower deck of the aircraft reserved for "first class" and "business class" passengers

"Economy class" passengers

Report No. 15855/00231/2012        Document No.        Sheet No. 3 / 7

**CORE OF THE OFFENSE**
**GATEWAY**

    The gateway used has the fleet number S 628. It is owned by the airline AIR FRANCE and has the inventory plate AF 3750 00 6628. Upon our arrival, we requested that Mr. Gilles Papin, AIR FRANCE Equipment Manager, who was present at the scene, obtain the documents regarding the maintenance of this mobile stairway (or gateway). This document was provided to us during our establishment of facts and is attached hereto. Our findings allowed us to establish that the gateway possesses 25 steps, an intermediary landing, as well as a movable step found at the bottom of the stairs. This is a gateway (or movable stairway) which is covered and placed on pneumatic jacks when it is in position for use. Upon our arrival, the jacks are in place. The gateway is positioned at the door "S" of the aircraft and it has not been moved.

**<u>The Judicial Police Officer</u>**

[Signature]

Report No. 15855/00231/2012     Document No.     Sheet No. 4 / 7

[Stamp - ORIGINAL]



Gateway positioned on the aircraft     Overview of the covered gateway
with fleet N° S628

Gateway in place, as well as the 4 pneumatic jacks

**The Judicial Police Officer**

[Signature]

The various investigations, as well as the images produced show that the slope is steep when accessing the gateway from the plane. This feeling is also evident from the bottom of the movable stairs.



Continuing our investigations, we find that on step No. 8, counting from the bottom (index 3), all of the non-slip tape is missing i.e. 143 cm. This missing tape does not in any way alter the working order of the step in dry weather conditions (which is the case). No swelling or hollow part is detectable.

Index # 4 corresponds to step No. 11, on which we note the absence of a 58 cm length of non-slip tape. At the cut, there is no stub that might cause a fall. However, without being specific, the witness (Ms. COSTENTIN) indicates that this step is close to the place where Mr. DELGADO fell.

A study of all the steps does not lead to the discovery of any wet, oily or bulky substance that could cause a slip or loss of balance. The railings on the sides are also present and in good condition. It should be noted that according to the witnesses, Mr. DELGADO had already lost his balance before reaching the step that is the subject of our index 3.

**The Judicial Police Officer**

[Signature]

Report No. 15855/00231/2012          Document No.          Sheet No. 6 / 7





## PRESUMED POINT OF IMPACT

The presumed point of impact of the victim's skull is immediately at the foot of the ramp. No biological element (except two bloodstains that are the subjects of indices 1 and 2) has been discovered. The concrete floor does not show anything in particular. The proximity of the stairway, suggests that the victim fell without bouncing and does not seem to have been handled before the arrival of emergency personnel. On-site, there remain the remains of the first aid kits and blankets used to care for the victim. These items are left for the airline AIR FRANCE to dispose of.

**The Judicial Police Officer**

[Signature]

Report No. 15855/00231/2012      Document No.      Sheet No. 7 / 7






### MISCELLANEOUS MEASURES

The gateway is the subject of a separate referral report (seal No. 1)

We are seeking to obtain a record of the technical characteristics of the self-propelled passenger stairways ABS580 (gateway),

- The victim was transported to the Salpetriere Hospital in Paris, before being transferred to the Robert Ballanger Hospital Center at Aulnay sous bois (93).

The relatives of the victim are being cared for by the airline AIR FRANCE and were transported to the hospital in Aulnay-sous-bois.

Our establishing of the facts ends on May 31, 2012 at 12:50 pm

Done and closed at TREMBLAY EN FRANCE (93) June 1st, 2012 at 1:00 pm

| | | |
|---|---|---|
| **Technical Stopover Equipment Instruction ITM 1004**<br>Self-propelled Passenger Stairway **ABS 580-3**<br>**DE-EK / BT** | | **AIR FRANCE**<br>[logo]<br>GENERAL OPERATIONS MANAGEMENT<br>**[Stamp - ORIGINAL]** |

## VISIT OPERATIONS
### VISIT V1 (1200 hrs or 64 weeks)

Sheet 1/3

**DATE:** 03 / 30 / 12        **NAME OF THE AGENT: Gaudiard**        **OT No.:** 593 646

**INVENTORY No. (10 digits): 3750-00-6628**                **HOURMETER: 3270**

| Rep | Description of the visit operations (Specifications) | DONE | NOT DONE | COMMENTS |
|---|---|---|---|---|
| 1 | Complete washing of the vehicle: See FA 1004-12 | | | |
| 2 | Perform a functional test serving as the entry inspection | X | | |
| | **MOTOR** | | | |
| 3 | Check Peugeot XUD9Ai motor according to **ITM 1024**<br>Check Perkins 104-22 motor according to **ITM 1464**<br>Check Perkins 404C-22 motor according to **ITM 1516** | X | | |
| | **TRANSMISSION:** | | | |
| 4 | Change transmission oil: **ElfmaticG3** | | | |
| 5 | On BV ZF or THM 180: Change the transmission intake filter | X | | |
| 6 | On BV Graziano: Change the transmission filter | ----------- | ----------------- | |
| | **CHASSIS:** | | | |
| 7 | Check electrolyte levels in the battery: **Distilled water** | | X | |
| 8 | Check the brake fluid level and the condition of the braking circuit | X | | |
| 9 | Grease the points equipped with greasers: **Epexelf 2 Grease**<br>See FA-1004-02 | X | | |
| 10 | Lubricate linkages and lubricate the parking brake cables. | X | | |
| 11 | Clean and grease the rack | X | | |
| 12 | Check tightness of screws. | X | | |
| 13 | Check and adjust the rear brake linings: **FA 1004-01.** | X | | |
| 14 | Check the brake fluid level: **Bendix L4680 65200**<br>In DOT 4: Mandatory replacement every 2 years | X | | |
| 15 | Front Axle: Check pads and brake discs and replace if necessary | X | | |
| 16 | Rear axle: Check the jaws and the brake drums and replace them if necessary. | X | | |
| 17 | Replace AR bridge oil: **TRANSELF EP 80W90** | X | | |
| 18 | Check the tightness of the screws for the brake calipers.<br>Tighten up with Loctite: **Loctite 2701 - Activator 7471** | X | | |
| 19 | Check tightness of screws of the cross rake: 20 m / DaN<br>Replace the bolts if necessary<br>Replace washers if they are bent<br>HM 8.8 16x50 Screw /Nylstop HM 16 8.8 Nut / LL16 Washer | X | | |
| | **BARRIER GATE:** | | | |
| 20 | Check the correct handling of the barrier. (Horizontal platform: Assistance for startup, the remaining mounting should be easy). | X | | |
| 21 | Check the system and the locking mechanism of the barrier (high position / low position) | X | | |

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.
Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)
Page **T. K.E-01**

| Technical Stopover Equipment Instruction ITM 1004 | **AIR FRANCE** |
|---|---|
| Self-propelled Passenger Stairway ABS **580-3** | [logo] |
| **DE-EK / BT** | **GENERAL OPERATIONS MANAGEMENT** |

**VISIT OPERATIONS**   [Stamp - ORIGINAL]

**VISIT V1 (1200 hrs or 64 weeks)**

Sheet 2/3

| DATE: | NAME OF THE AGENT: | OT No.: |
|---|---|---|
| **INVENTORY No. (10 digits):** | | **HOURMETER:** |

| Rep | Description of the visit operations (Specifications) | DONE | NOT DONE | COMMENTS |
|---|---|---|---|---|
| | **POWER LIFT:** | | | |
| 22 | Check the correct handling of step. | X | | |
| 23 | Check the condition of the stops. Change if necessary. | X | | |
| 24 | Check the system and operation of the locking of the step (high position) | X | | |
| | **HYDRAULICS:** | | | |
| 25 | Drain the hydraulic oil (or recycle) then refill: **Hydrelf 46** Tank contents 80 L. | X | | |
| 26 | Clean the breather filter | X | | |
| 27 | Check the condition of cylinders | X | | |
| 28 | Change hydraulic oil return filter | X | | |
| 29 | If equipped: Check the desiccant filter (Pink cartridge=change) | X̶ | ---------------- | |
| | **ELECTRICITY** | | | |
| 30 | Check the electrical assists: turn signals, various wiring, as well as the effectiveness of the emergency stop, lighting cells | X | | |
| 31 | Check the charging voltage for the electrical circuit. | X | | |
| | **CANOPY / FLIGHT OF STAIRS:** | | | |
| 32 | Check the condition and operation of the canopy and bellows. | X | | |
| 33 | Verify the proper operation of safety cable rack electromagnets. Replace if necessary | X | | |
| 34 | Check the free movement of the 2 sliding rails and the absence of foreign bodies in the track. Replacing the elastics on each side of the side rails. Check the automatic return of these side rails. | X | | |
| 35 | Check the condition of front threshold of the platform; it must not be distorted at its ends. | X | | |
| 36 | Check the functioning of the swiveling spout underneath the platform as well as the condition of the skids. The swing spout must slide freely and not remain in the retracted position. | X | | |
| 37 | Check the presence and the condition of the anti-skid strip located at the extremity of the steps | X | | |
| | **GENERAL:** | | | |
| 38 | Check for presence of the reflective bands, AF logos and No. | X | | |
| 39 | Check tire condition and pressure: **8 bars** | X | | |
| 40 | Check torque of 4 wheels: **32 m/kg** | X | | |
| 41 | Ensure the closing of the covers with square barrel locks, replace if necessary. | X | | |
| 42 | Check for presence of fuel oil or diesel labels, replace if necessary. (PAG-K-2.4 DEBT 17) | X | | |

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.
Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)

Page T. K.E-02

| Technical Stopover Equipment Instruction ITM 1004 | **AIR FRANCE** |
|---|---|
| Self-propelled Passenger Stairway **ABS 580-3** | [logo] |
| **DE-EK / BT** | **GENERAL OPERATIONS MANAGEMENT** |

**[Stamp - ORIGINAL]**

## VISIT OPERATIONS

### VISIT V1 (1200 hrs or 64 weeks)

Sheet 3/3

| DATE: | NAME OF THE AGENT: | OT No.: |
|---|---|---|
| **INVENTORY No. (10 digits):** | | **HOURMETER:** |

| Rep | Description of the visit operations (Specifications) | DONE | NOT DONE | COMMENTS |
|---|---|---|---|---|

PERFORM THE END OF VISITS FUNCTIONAL TESTING

**COMPLETE THE CRMT BOOKLET ACCURATELY**

This information is important, it is computer processed in order to refine the suggested maintenance policy.

**ADDITIONAL WORK OR WORK ON HOLD:**

**AGENT APPROVAL:**

[Signature]

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.
Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)
Page **T. K.E-03**

| Technical Stopover Equipment Instruction **ITM 1004** | **AIR** |
|---|---|
| **FRANCE** | |
| **Passenger Stairway ABS 580** | [logo] |
| **DE.BT** | **GENERAL OPERATIONS MANAGEMENT** |

## FUNCTIONAL TESTS

**STATIC CHECKS**

> **THESE TESTS TO EVALUATE THE CONDITION OF THE MACHINE ARE TO BE PERFORMED AT EACH PERIODIC MAINTENANCE VISIT AT ENTRY / EXIT**

**A) READ THE CRMT AND NOTE IF THERE ARE USEFUL COMMENTS FOR THE NEXT VISIT**
**B) PREPARE A REQUEST FOR ACTION FOR ANY ANOMALY ENCOUNTERED.**

| Inventory No.: 628    Potential: 3270   DATE: 03/30/12    Done by:  GAUDIARD |
|---|

| Checks | Comments | Entry | | Exit | |
|---|---|---|---|---|---|
| **STATIC CHECKS** | | OK | NC | OK | NC |
| | | | | | |
| **1-CHASSIS** | | | | | |
| Check: | | | | | |
| -The general condition of the chassis + paint | | X | | X | |
| -The condition of the various cylinders | | X | | X | |
| -The condition of the front and rear wheels | | X | | X | |
| -The presence and status of the clearance gauges | | X | | X | |
| -The condition of the brand labels and safety labels | | X | | X | |
| Check the integrity of the failure code labels      (replace if necessary) | | X | | X | |
| -Check the levels (Engine, BV, coolant, brake fluid, hydraulic...) | | | X | X | |
| | | | | | |
| **2-FLIGHT OF STAIRS-PLATFORM** | | | | | |
| Check: | | | | | |
| -General condition of the 2 canopies, of the handrail and the steps | | X | | X | |
| -The correct positioning of the upper flight of stairs for safety | | X | | X | |
| -The condition and operation of the slide rails on the platform | | X | | X | |
| -The proper operation of the swiveling spout and the condition of the Teflon pads. | | X | | X | |
| -The condition and operation of the platform bellows. | | X | | X | |
| -The general condition (impacts, deformations, etc.) and the operation of the barrier gate. | | X | | X | |
| The general condition (impacts, deformations, etc.) and the operation of the retractable step. | | X | | X | |
| -The condition and presence of the inclinometer | | X | | X | |
| -The condition of the flight of stairs lighting | | | X | X | |

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.
Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)

Page T. J-01

| Technical Stopover Equipment Instruction ITM 1004 | **AIR FRANCE** |
|---|---|
| Passenger Stairway ABS 580 | [logo] |
| **DE.BT** | **GENERAL OPERATIONS MANAGEMENT** |

| Checks | Comments | Entry | | Exit | |
|---|---|---|---|---|---|
| **STATIC CONTROLS** | | **OK** | **NC** | **OK** | **NC** |
| | | | | | |
| **3-DRIVING CAB** | | | | | |
| Check: | | | | | |
| -Presence and condition of sign panels | | X | | X | |
| -Presence and status of the 3 mirrors | | X | | X | |
| -Presence of hand pump lever | | X | | X | |
| | | | | | |
| **4-ELECTRICAL** | | | | | |
| Check: | | | | | |
| - The warning lights and indicators. | | X | | X | |
| - Lighting and signals. | | X | | X | |
| - Electrical services (lights, work lights, battery switch, rotating emergency lights, emergency shutdowns, backing up alarm if equipped) | | | X | X | |
| | | | | | |
| **5-GPS** | | | | | |
| Check the positioning system: -Turn the machine on and check on the application if the positioning and the activation are correct (yellow color) | | X | | X | |

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.
Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)
Page **T. J-02**

| Technical Stopover Equipment Instruction **ITM 1004** | **AIR FRANCE** |
|---|---|
| **Passenger Stairway ABS 580** | [logo] |
| **DE.BT** | **GENERAL OPERATIONS MANAGEMENT** |

## FUNCTIONAL TESTS

**Dynamic Checks**

> **THESE TESTS TO EVALUATE THE CONDITION OF THE MACHINES ARE TO BE PERFORMED AT EACH PERIODIC MAINTENANCE VISIT UPON ENTRY/EXIT**

**A) READ THE CRMT AND NOTE IF THERE ARE USEFUL COMMENTS FOR NEXT VISIT**
**B) ESTABLISH AN APPLICATION FOR ACTION FOR ANY ANOMALY ENCOUNTERED.**

| Inventory No.:  628    Potential:  3270   DATE:  03/30/12      Done by:  GAUDIARD |
|---|

| Checks | Comments | Entry | | Exit | |
|---|---|---|---|---|---|
| **STATIC CONTROLS** | | OK | NC | OK | NC |
| | | | | | |
| **1-Tests of the Vehicle** | | | | | |
| Check: | | | | | |
| - Driving tests Fw and Rv (in Rv check the buzzer trigger) | | | X | X | |
| -The proper steering operation | | X | | X | |
| -Test the service and parking brakes | | X | | X | |
| -As of No. 3750.05.6676 check at low speed if the canopy is deployed | | X | | X | |
| -Testing of emergency maneuvers | | X | | X | |
| | | | | | |
| **2-Stabilization:** | | | | | |
| Check: | | X | | X | |
| -The lighting of the red "stands deployed" light | | X | | X | |
| -The lighting of the green "stands retracted" light | | X | | X | |
| -The lighting of the platform strobe lights as soon as the vehicle is destabilized | | X | | X | |
| | | | | | |
| **3-Check that the following are impossible** | | | | | |
| -To start up if the Fw or Rv drive is activated | | X | | X | |
| -To drive if the green "stands retracted" light is off | | X | | X | |
| -To drive in reverse if the retractable step is down | | X | | X | |

When printing and/or photocopying, document tracking is no longer guaranteed and you commit become responsible.

Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)

Page **T. J-03**

| Technical Stopover Equipment Instruction **ITM 1004** | **AIR FRANCE** |
|---|---|
| **Passenger Stairway ABS 580** | [logo] |
| **DE.BT** | **GENERAL OPERATIONS MANAGEMENT** |

| Checks | Comments | Entry | | Exit* | |
|---|---|---|---|---|---|
| **DYNAMIC CHECKS** | | OK | NC | OK | NC |
| | | | | | |
| **4-Laser-Approach Radar** | | | | | |
| -Check the proper functioning and correct positioning of the laser | | X | | X | |
| -Check the operation of the approach radar | | X | | X | |
| | | | | | |
| **5-Safety Shoes** | | | | | |
| -Check for proper operation of safety shoes despite the battery switch off + contact off (siren + strobe light) | | X | | X | |
| | | | | | |
| **6-Smart Key:** | | | | | |
| Operation of the smart key: No possible movement of the staircase if no smart key. | | X | | X | |
| Check the setting of the lock and the insertion of prohibited keys. | FA 1437-14 | X | | X | |

**\* It is imperative to perform a functional exit test if the agent has serviced the checked item. Otherwise, the input test is sufficient.**

| **AFTER FUNCTIONAL TESTING AND BEFORE MAKING EQUIPMENT AVAILABLE TO USERS** |
|---|
| [warning sign]      **LIST BELOW THE POSSIBLE PROBLEMS**      [warning sign] |
| |
| |
| |
| |
| **ACCEPTANCE BY THE CHAIN OF COMMAND** |
| **FOR USE IN SERVICE**     \| YES \| NO \| |
| APPROVAL: [signature] |

When printing and/or photocopying, document tracking is no longer guaranteed and you become responsible.

Before any use, check compliance with the reference document on the website DE.BT (under Lotus Notes)
Page **T. J-04**

**The Cakov Group**
Language Solutions, Inc.

2600 Douglas Road, Suite 1103, Coral Gables, Florida 33134
Tel: 305.854.8181          •          Fax: 305.854.8122
info@cakovlanguagesolutions.com
www.cakovlanguagesolutions.com

**STATE OF FLORIDA**

**COUNTY OF MIAMI-DADE**

### CERTIFICATION

This is to certify that the following is, to the best of our knowledge and belief, a true and accurate translation into <u>English</u> of the referenced <u>French</u> language document:

**~ Investigative Inquiry (Gendarmerie Nationale) Unit Code 15855, Report No. 231, dated June 1, 2012.**

Before me, the undersigned Authority, personally appears <u>Mr. Christopher Cakov</u> who is personally known to me / is identified with the following:

~ Florida Driver's License # C210-114-74-053-3

_____
Christopher Cakov
VP Business Development

Sworn and subscribed before me this <u>25</u>th day of <u>March</u> <u>2013</u>.

_____
Notary Public State of Florida at Large

JESSICA S. MORALES
Notary Public - State of Florida
My Comm. Expires Jun 13, 2016
Commission # EE 207862

My commission expires:

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

## Exhibit C

**AIRFRANCE /**

# Rapport du Commandant

Statut :    **E1, envoyée à l'expert**     Réceptionnée au Relais RDC le* : **01/06/2012**

Etat :

Codification Relais RDC* : **Carine Kieffer**

**eRDC – Copie envoyée au CDB :** ☒ .

## Identité Remarque
### L'évènement

| | | |
|---|---|---|
| Date départ tronçon en TU* : **30/05/20 12** | N° Vol* : **AF695** | Escale MIA départ* : |
| Heure départ tronçon (réalisée) en TU : **22:06** | Escale CDG concernée* : | Escale CDG arrivée* : |
| Date Tête de Ligne : **30/05/2012** | Durée retard : **15** | |

### L'avion / L'équipage

| | | |
|---|---|---|
| Type avion : **744** | Immat Avion : **FGITE** | **AME** |

## Texte Remarque

Codification niv 1* :    P.TRAITEMENT AU SOL DU PASSAGER

Point de parking :    H08

| Texte de la remarque* : | "e-RDC"<br><br>Vol arrivé avec 22mn de retard au large, parking H08, avec de nombreux passagers en correspondance.<br>Au moment du débarquement des premiers passagers du pont supérieur par l'escalier de la porte 2, un de nos passagers portant un ou deux gros bagages à main est déséquilibré dans l'escalier et chute lourdement en se cognant la tête.<br>Le débarquement est stoppé.<br>Le CCP nous appelle par l'interphone pour demander des secours.<br>Ceux-ci arrivent rapidement dans les 5 minutes et évacuent notre passager inconscient sur une civière.<br>Une deuxième passerelle est positionnée en porte 1 et le débarquement reprend dans les 10 mn.<br>Plusieurs appels sont passés au PC pour demander une assistance de renfort et une aide de l'escale pour soutenir la famille du passager blessé.<br>La Gendarmerie, la PAF et la police judiciaire sont sur place rapidement pour recueillir des témoignages et relever les identités et contacts de l'équipage.<br>J'ai été contacté par téléphone par la gendarmerie, mais n'ai pas fait de déclaration écrite à ce jour, les enquêteurs ayant suffisamment d'éléments. |  |

Réponse souhaitée : ☒ .

Texte traduit :

Commentaire Relais    OPL : PELLEGRIN
RDC :

Pièce jointe :

Adresse destinataire :  EXPERT 2

---

**Expertise**

| | |
|---|---|
| Codification niv2* : | |
| Codification niv3 : | |
| **Niveau de traitement *:** | |
| Résumé significatif* : | |
| Commentaire expert : | |
| Responsable d'Action nommé : | |
| Pièce jointe : | |
| Réponse expert : | |

---

**Historique 1er échange**

Remarque réceptionnée le 01/06/12 à 17:53:02 par Import eRDC
Modifié le 04/06/2012 à 8:00:23 par Carine Kieffer
Modifié le 04/06/2012 à 12:39:30 par Carine Kieffer
Envoyé le 04/06/2012 à 12:39:33 par Carine Kieffer à EXPERT 2(Expert) par le Relais RDC

*Translation of Rapport du Commandment*

## Captain's Report

**Identifying Note**

| Event | | | | | |
|---|---|---|---|---|---|
| Date of departure of leg in UT [Universal Time] | 5/30/2012 | Flight No. | AF695 | Departure Station | MIA |
| Hour of departure (UT) | 22:06 | Stationed concerned | CDG | Arrival station | CDG |
| Date of the start of the line | 5/30/2012 | Length of delay | 15 | | |
| Aircraft/Crew | | | | | |
| Aircraft type | 744 | No. Aircraft | FGITE | AME | |

**Text Note**
Codification Level 1: Treatment of passenger on the ground
Parking area: H08

| Text of the remark | "e-RDC" |
|---|---|
| | Flight arrived 22 minutes late overall, parking at H08, with a number of passengers connecting. At the time of disembarking of the first passengers on the upper deck by the stairs from door 2, one of our passengers carrying one or two large carry-ons lost his balance on the stairs and fell heavily banging his head. The disembarking was stopped. The CCP called us on the inter-phone and requested emergency services. They arrived rapidly within 5 minutes and evacuated our unconscious passenger. A second staircase was positioned on door 1 and the disembarkment resumed in 10 minutes. Several calls were made through PC to request back-up assistance and station help for the |



EXHIBIT
Wahrmund
6 for FD
7-9-13-HV
PENGAD 800-631-6989

| | family of the injured passenger. The Gendarmerie, the PAF, and the judicial police were on scene rapidly to collect the witnesses and to pick up the identity and contact information for the crew. I was contacted by phone by the Gendarmerie, but I did not make a written statement today, the investigators sufficiently had the information. |
|---|---|
| Response requested | X |

[Not relevant]

**History of the first exchange**
Remark received on June 1, 2012 at 17:53:02 by import eRDC
Modified June 4, 2012 at 8:00:23 by Carine Kieffer
Modified June 4, 2012 at 12:39:30 by Carine Kieffer
Sent on June 4, 2012 at 12:39:33 by Carine Kieffer to EXPERT 2 (Expert) by RDC

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

## Exhibit D

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA FLORIDA
 2                       MIAMI DIVISION

 3
                CASE NO.  12-CV-23272-Graham/Goodman
 4

 5
 6    SONIA DELGADO, JUAN ENRIQUE DELGADO,
      and JACQUELINE CABRERA, as co-Personal
 7    Representatives of the Estate of
      Juan Delgado, Deceased,

 8
              Plaintiffs,

 9
      vs.

10
      DELTA AIR LINES, INC.,

11
              Defendant.

12    _____/

13
                         Suite 800
14                 25 West Flagler Street
                      Miami, Florida
15          Tuesday, 1:15 p.m. to 3:52 p.m.
                   February 21, 2013

16
17
18          DEPOSITION OF JACQUELINE CABRERA

19
20
21
22        Taken on behalf of the Defendant before
23    Nancy Gilbert, FPR, RMR, RDR, CRR, Notary Public in
24    and for the State of Florida at Large, pursuant to
25    Notice of Taking Deposition in the above cause.
```

**CERTIFIED TRANSCRIPT**

Page 46

1  attendants when you were in that area, in the general
2  area of the galley and the exit door, or --
3       A.  No, just the one at the galley -- in the
4  galley.
5       Q.  Did you say anything to that flight
6  attendant?
7       A.  No.
8       Q.  Did you hear either of your parents say
9  anything to that flight attendant?
10      A.  No.
11      Q.  So was there anybody between you and your
12  mother as you were going down the internal staircase?
13      A.  Yes.
14      Q.  Were they other passengers, or were some of
15  your kids in between?
16      A.  Passengers and one -- one of my children.
17      Q.  Which one of your children?
18      A.  Joseph.
19      Q.  Did you actually see your father fall?
20      A.  No.
21      Q.  Did you hear your father fall?
22      A.  No.
23      Q.  Did you see your father when he got on that
24  external staircase?
25      A.  No.

Page 47

1       Q.  Did you see your mother when she got on the
2  external staircase?
3       A.  No.
4       Q.  Do you know how your father was carrying
5  his two bags when he got on the external staircase?
6       A.  No.
7       Q.  From your own independent recollection, and
8  not from what you heard your mother testify to, do you
9  know if there were any passengers between your mother
10 and your father who were exiting on that external
11 staircase?
12      A.  Yes.
13      Q.  How do you know that?
14      A.  Because when I was at the top of the
15 stairs, they were a little bit more ahead of me and
16 there were passengers between me and them and my son.
17 So...
18      Q.  All right.  So when you were at the top of
19 the stairs, your father was already on the staircase?
20      A.  Yes.
21      Q.  Had he already fallen at that point, or was
22 he still on the staircase when you were on the top of
23 the external staircase?
24      A.  He had not fallen just yet.
25      Q.  Okay.  So can you give me the order of your

Page 48

1  family members as they were exiting the aircraft?
2  Your father was first?
3       A.  My father was first.  My mother, Joseph,
4  myself, and then my other son Miranda -- my other son
5  Alexander.
6           MR. MARKS:  I was going to say.
7           THE WITNESS:  And then Miranda.  That was
8       the order of the family.  But there were,
9       obviously, people in between us.
10 BY MS. LAMBERT:
11      Q.  All right.  Were there any people between
12 your mother and Joseph?
13      A.  Yes.
14      Q.  How many people were between them?
15      A.  Two or three.  And when I say "two or
16 three," it wasn't like one behind the other.  It was
17 kind of side by side and behind, you know, because
18 everybody was like all jumbled together.
19      Q.  Was the upper deck full of passengers?
20      A.  Yes.
21      Q.  At any time during the flight did you go to
22 the lower deck?
23      A.  Yes.
24      Q.  Did you observe whether that was full?
25      A.  No.

Page 49

1       Q.  Why did you go to the lower deck during the
2  flight?
3       A.  Because I was looking for one of the flight
4  attendants to get a bottle of wine.
5       Q.  I'm sure you've talked to your children
6  after the accident about what happened; is that
7  correct?
8       A.  Yes.
9       Q.  All right.  Did Joseph tell you whether he
10 saw his grandfather fall?
11      A.  He did not see him fall.
12      Q.  And the other children were behind you --
13      A.  Right.
14      Q.  -- so I assume they didn't see it?
15      A.  Correct.
16      Q.  Okay.  I understand from your brother's
17 testimony that you read at least parts of the police
18 report; is that correct?
19      A.  I read whatever I was able to read of the
20 police report, yeah.  Because it -- Some of it was
21 French and some of it was translated.  So, yeah.
22      Q.  Okay.  Did you obtain that from your
23 attorney --
24      A.  No.
25      Q.  -- or some other way?

13 (Pages 46 - 49)

Page 62

1  aisle --
2  BY MS. LAMBERT:
3      Q.   From the lower deck?
4      A.   -- from the lower deck, that's what the one
5  by one was (indicating).  That, you know, like a
6  passenger on the lower deck was letting one of the
7  people from the upper deck in, then one, like that, to
8  be able to get to the door (indicating).
9      Q.   So two streams of passengers were merging?
10     A.   Merging to get to the door.  Correct.
11     Q.   Okay.  Then you say, "The bridge was wide,
12 and five people could stand on it."  And you drew a
13 diagram?
14     A.   Yes, I did.
15     Q.   You drew a diagram.  And that's not in the
16 translation.
17     A.   Okay.
18     Q.   Oh, it is in the translation.  Okay.
19     A.   Yes.
20     Q.   You can look at that.
21     A.   This is what, like, my perception was.
22 Like, when I was standing at the top, it was like
23 everybody was, like, all, you know -- how do you
24 say -- mushed together.  You know?
25     MS. LAMBERT:  Okay.  I'm going to mark

Page 63

1  this as Exhibit 10.
2      (Thereupon, the document/item referred
3  to was marked for identification as Defendant's
4  Exhibit 10.)
5  BY MS. LAMBERT:
6      Q.   This is another section of the police
7  report.  And I don't have a translation.  But this was
8  the section of the police report where they attached a
9  diagram and the specifications of the external
10 staircase.  And I want to turn your attention to an
11 English translation.  They attached to the police
12 report both the English version and the French version
13 of the specifications.
14     A.   Okay.
15     Q.   And you see right here, the "Width of the
16 Flight."  And I believe that means the width of the
17 flight of the staircase.
18     A.   Okay.
19     Q.   And it says it is 59 inches.
20     A.   So, 5 feet.
21     Q.   Yes.  About 5 feet.
22     All right.  And I bought a tape measure,
23 because I always come prepared with a tape measure.
24 It happens to be a 5-foot-long tape measure.
25     You know, if you will look at the tape

Page 64

1  measure and look where I'm standing.  And if I had a
2  bag with me, would you agree that the staircase, if it
3  is indeed 59 inches wide, couldn't fit five people
4  across?
5      MS. VALDIVIA:  Object to the form.
6      THE WITNESS:  Maybe not five, but three
7  to four for sure.
8      Again, everybody was very, like, shoulder
9  to shoulder.  Whether they had carry-ons or
10 whatever, everybody was, like, tight
11 (indicating).  It was very tight.
12 BY MS. LAMBERT:
13     Q.   Okay.  Because I take up -- I take up about
14 half of this distance, and I'm a normal-sized person.
15 So...
16     A.   Right.  But you're not in a hurry, trying
17 to get off the plane with bags and, you know, being
18 shoved by other passengers, which is what I'm trying
19 to describe.  You know, like everybody was bumping
20 into each other, next to each other, shoulder to
21 shoulder and stuff.
22     You know, you're just at ease and trying to
23 make a -- how do you say -- you know, like a
24 description.  You know?  So it's not the same.
25     Q.   All right.  Now, in your diagram, you show

Page 65

1  like circles that represent people?
2      A.   Right.  My dad, my mom, Joseph.
3      Q.   All right.  And did you draw this diagram?
4      A.   I did.
5      Q.   So you show your father about halfway down
6  the staircase?
7      A.   Right.
8      Q.   And then your mother, you show directly
9  behind him?
10     A.   Well, this is just because that's what I
11 remember the order to be.
12     Q.   All right.
13     A.   So it was, you know, my father first, then
14 my mother, then Joseph, and myself, and then Miranda,
15 and Alexander later.
16     Now, whether there were people in between
17 or not, you know, it's hard for me to tell, because
18 everybody was, like, so mashing up.  But I do remember
19 the order, and that's what I'm depicting here,
20 basically, you know, the order of who went first and
21 that.  But what I do remember is that we were all on
22 the left.
23     Q.   All right.  But from your vantage point,
24 you were still in the aircraft itself when your father
25 fell?

17 (Pages 62 - 65)

Page 78

1 your step?
2     A.    I don't recall, but I probably just said
3 that because I think that's a natural thing, either
4 "Watch your step" or "Have a good trip." You know?
5     Q.    Would you agree that your memory of the
6 events that day was better when you gave this
7 statement shortly after the accident than it is today?
8     A.    I would say pretty equal. I remember
9 everything very well.
10     Q.    All right. Assuming that somebody told you
11 to watch your step, is that the person that was
12 stationed in the galley area near the exit that you
13 mentioned was up there?
14     A.    Assuming that it -- If somebody did say
15 that, it would have been that person. There was no
16 other crew person at the door.
17     Q.    Yes, you said, "I think it was the person
18 who was standing next to the kitchen."
19     A.    Yeah.
20     Q.    Okay. You said in the bottom paragraph
21 that your father "was halfway down when he fell." How
22 did you know that?
23     A.    Based on what my mother told me --
24     Q.    All right.
25     A.    -- where they were, and what my son told

Page 79

1 me.
2     Q.    And you said, "He was going down normally,"
3 meaning he wasn't walking too fast or walking too
4 slow?
5     A.    Right. He was in the flow. Like we all
6 were. And that, you know, was easy to see. Everybody
7 was in that flow.
8     Q.    "He had two bags that he was pulling down
9 behind him." Are those the bags that we were talking
10 about before, the wheeled carry-on bag --
11     A.    Right.
12     Q.    -- and then his personal bag?
13     A.    And the small bag.
14     Q.    All right. How were they situated?
15 Because I think you said -- Yes. You said further
16 on, "The smaller luggage was stacked on the big one."
17     A.    Yes.
18     Q.    Do you recall that?
19     A.    Yes.
20     Q.    Were they attached somehow? Because on
21 some of those bags, you actually have a thing where
22 you can attach the bags together.
23     A.    I don't know.
24     Q.    All right. Then you said, "The bags were
25 going down the stairs one step at a time and were

Page 80

1 hitting the steps."
2     A.    You know, like, boom, ba-boom, ba-boom,
3 ba-boom, ba-boom, as everybody else's -- mostly
4 everybody else's were.
5     Q.    So was it your understanding that your
6 father had pulled up the handle --
7     A.    Yes.
8     Q.    -- and was pulling it behind him?
9     A.    Yes.
10     Q.    All right. You don't know if your father
11 was holding on to the handrail, correct?
12     A.    I did not see him hold on to the handrail,
13 but I was told by my mother and Joseph that he was
14 holding on to the handrail with his left hand.
15     Q.    All right. So he was pulling the bags
16 behind him with his right hand?
17     A.    Correct.
18     Q.    All right. In the second page of your
19 translated statement, it says, "Immediately after the
20 fall, a person from Air France came to help my
21 father."
22           Is that the one that you talked about that
23 had the --
24     A.    Yes.
25     Q.    -- oxygen mask?

Page 81

1     A.    Yes. But she didn't bring the oxygen mask
2 immediately. She came to see what was going on.
3     Q.    So was that the one who came from the
4 airplane, as opposed to the one who was already on the
5 tarmac?
6     A.    Sorry? Rephrase that.
7     Q.    The person from Air France who came
8 immediately to help your father, who was that?
9     A.    She was just somebody who was already down
10 on the ground and was talking with whatever crew, from
11 my recollection, whatever crew was ground crew.
12     Q.    All right.
13     A.    But she wasn't, like, near the plane. As a
14 matter of fact, I remember seeing her come to him from
15 that side (indicating). Yeah.
16     Q.    Approximately how long did it take for the
17 rescue people to arrive?
18     A.    About ten minutes.
19     Q.    Did any police arrive on the scene?
20     A.    Yes.
21     Q.    Was that the same guy who was following you
22 around?
23     A.    No.
24     Q.    Okay.
25     A.    No. This was first the airport police, and

21 (Pages 78 - 81)

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

# Exhibit E

CONDENSED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 12-CV-23272-Graham/Goodman

SONIA DELGADO, JUAN ENRIQUE
DELGADO & JACQUELINE CABRERA,
as co-Personal Representatives
of the Estate of Juan Delgado,
Deceased,

       Plaintiffs,

-vs-

DELTA AIR LINES, INC.,

       Defendant.

_____/

701 Brickell Avenue,
Suite 3000,
Miami, Florida,
Tuesday, 10:00 a.m.,
July 9, 2013.

D E P O S I T I O N

of

MELANIE WAHRMUND
taken on behalf of the Plaintiffs
pursuant to a Notice of Taking Deposition
Duces Tecum

– – –

BRUMM, VEGA & ASSOCIATES, INC.  (305) 374-3340

Page 54

1   Miami?
2       A. I don't recall the exact departure time. It's
3   probably on here. 22:06 and I think this is in Greenwich
4   meantime, isn't it?
5       Q. And what was the scheduled arrival time?
6       A. I believe that--didn't they arrive around 8:25?
7   Is that correct?
8       They don't have the time on there, but it was
9   22 minutes past the scheduled departure time.
10      Q. Can I see what you're looking at?
11      A. Yes. The captain's report.
12      MS. VALDIVIA: We'll go ahead and mark
13      these as the next two exhibits.
14      The English version will be six and
15      the French version will be seven.
16      (The documents referred to were marked
17      for identification as Exhibit Nos. 6 and 7
18      respectively.)
19  BY MS. VALDIVIA:
20      Q. Mrs. Wahrmund, did you ever speak to the
21  captain of this flight?
22      A. No.
23      Q. Do you have any information about the captain's
24  information apart from what is in this report?
25      A. No.

Page 55

1       Q. Would the captain of the aircraft also be
2   required to stay on board the aircraft until all
3   passengers have disembarked?
4       A. I did not read Air France's specific procedure
5   for that, but that would be normal.
6       Q. Do you know where the captain of the flight was
7   at the time that Mr. Delgado fell?
8       A. May I see his report again?
9       It doesn't state specifically, but I would
10  presume in the cockpit.
11      Q. The next sentence of your report, and sorry for
12  how we have to do this, but we have to kind of parse
13  every word and understand what you mean by your writing.
14      So, I apologize in advance for the next line of
15  questioning, but...
16      A. What page are you on again?
17      Q. Page 4.
18      A. Okay.
19      Q. It says, "During boarding in Miami, Mr. Delgado
20  reportedly carried his one approved bag, as well as his
21  personal bag"...
22      Because you write one approved bag, are you
23  insinuating that the two of them combined was then not
24  approved?
25      A. I'm sorry. Could you rephrase that?

Page 56

1       Q. Sure. You write he carried his one approved
2   bag, as well as his personal bag. So, you didn't write
3   as well as his approved personal bag. So I'm trying to
4   figure out if you're saying here that the personal bag
5   was not an approved item?
6       A. That was not my intent.
7       My intent was that he carried on a piece of
8   luggage as well as a personal item.
9       Q. ..."which weighed 10 kilos and 4 kilos
10  respectively."
11      Were the weight limits of those two bags within
12  the proper guidelines?
13      A. Definitely within reason. I believe Air
14  France's procedures as stated in the report has one for
15  main cabin and a different purpose in class, but yes.
16      Q. So there's nothing inherently unsafe about the
17  weight of his bags. Correct?
18      A. No.
19      Q. What about the size of his bags?
20      A. I believe the size were within reason, as well.
21      Q. On Page 5, the top line, it says, "Mr. Delgado
22  carried his primary piece of luggage and personal duffle
23  bag to the upper deck."
24      Do you know how he carried it?
25      A. Onto the airplane?

Page 57

1       Q. Yes.
2       A. And can you explain what you mean by how he
3   carried it?
4       Q. Well, there's some testimony in the difference
5   between pulling a suitcase behind you up every step or
6   actually holding onto the handle that's affixed to the
7   luggage. So, when I ask you how he was carrying it, I'm
8   generally talking about between one of those two ways.
9       And then the difference between his primary
10  piece of luggage and the personal bag is whether he had
11  it on his shoulder or whether he had it on top of the
12  suitcase affixed to the telescoping arm.
13      So, when I ask you how, I mean in that context.
14      A. And are you specifically asking about during
15  boarding?
16      Q. I'm asking this particular sentence that you're
17  writing here. It's your report. So I'm trying to figure
18  out. It says, "Mr. Delgado carried his primary piece of
19  luggage and personal duffle bag to the upper deck." I'm
20  assuming that's during boarding.
21      A. Yes. That's what my intention was here. I
22  just wanted to make sure your question was for that.
23      Q. My intention is to understand what you mean by
24  your report. So, you can help me in any way possible.
25      A. I don't recall specific language in any of the

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

## Exhibit F

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA FLORIDA
2                       MIAMI DIVSION
3
               CASE NO.  12-CV-23272-Graham/Goodman
4
5
6   SONIA DELGADO, JUAN ENRIQUE DELGADO,
    and JACQUELINE CABRERA, as co-Personal
7   Representatives of the Estate of
    Juan Delgado, Deceased,
8
             Plaintiffs,
9
    vs.
10
    DELTA AIR LINES, INC.,
11
             Defendant.
12   _____/
13
14                     Suite 800
                 25 West Flagler Street
15                  Miami, Florida
            Tuesday, 10:20 a.m. to 1:38 p.m.
16               February 19, 2013
17
18
19            DEPOSITION OF SONIA DELGADO
20
21
22      Taken on behalf of the Defendant before
23   Nancy Gilbert, FPR, RMR, RDR, CRR, Notary Public in
24   and for the State of Florida at Large, pursuant to
25   Notice of Taking Deposition in the above cause.

CERTIFIED TRANSCRIPT

Page 70

1    A.  I'm not sure if side by side because mostly
2  everybody had, you know, stuff.  So I can't say side
3  by side.
4    Q.  When you were at the doorway of the
5  airplane and you noticed the staircase, was your
6  husband already on the staircase?
7    A.  Maybe a little bit, two or three steps
8  ahead.
9    Q.  And then there were two passengers between
10 you and your husband?
11   A.  (Nodding head.)
12   Q.  Were they male or female, did you notice?
13   A.  I remember big.
14     MR. MARKS:  You remember what?
15     THE WITNESS:  Dark.
16     MR. MARKS:  Big?
17     THE WITNESS:  Big figures, dark figures
18   in front of me.  I don't know if they were male
19   or female.  But I would tend to think, I mean,
20   more male than female.
21 BY MS. LAMBERT:
22   Q.  Did either of those two passengers between
23 you and your husband have any carry-on bags?
24   A.  I don't recall.  I really don't recall.
25   Q.  All right.  Tell me what happened after

Page 71

1  that.
2    A.  Oh, okay.  Here comes the difficult part.
3    Q.  I know.  I'm sorry.  If you want to take a
4  break, just let me know.
5      MR. MARKS:  Whatever you want.  Do you
6  want to take a break for a minute?
7      THE WITNESS:  Yes, why don't we take a
8  break before we go into that.
9      MS. LAMBERT:  Okay.
10     MR. MARKS:  Can you finish everything
11 else first, and then get into the hard part?
12     MS. LAMBERT:  Let's see.
13     MR. MARKS:  Or are we at the hard part
14   and that's it?
15     MS. LAMBERT:  I mean, I'm sort of taking
16   it in chronological order.
17   We can go off the record.
18     MR. MARKS:  Yes.
19     (Discussion off the record.)
20     (Thereupon, a recess was taken in the
21 proceedings from 11:57 a.m. to 12:11 p.m., after
22 which the following proceedings were had:)
23 BY MS. LAMBERT:
24   Q.  I'm going to ask you some other questions
25 for now.

Page 72

1    A.  All right.
2    Q.  You have flown many times, correct?
3    A.  Yes.
4    Q.  Have you flown on 747s before?
5    A.  I owned a travel agency for a time, so we
6  had all kinds of free tickets from Pan Am and Eastern
7  and all that.  So I've flown quite a bit.
8    Q.  So you and your husband were seasoned
9  travelers?
10   A.  Yes, ma'am.
11   Q.  All right.  Was there anything out of the
12 ordinary with this particular flight, until you
13 landed?
14     MR. MARKS:  Other than what she has
15   already said?
16     MS. LAMBERT:  Well, I am just asking it
17   in a different way.
18     MR. MARKS:  Okay.
19 BY MS. LAMBERT:
20   Q.  Was there anything out of the ordinary?
21   A.  It was, like you said, uneventful.
22   Q.  Was there anything unusual with regard to
23 the disembarking process before you reached the
24 external staircase?
25   A.  Yes.  I would say, it was like everybody

Page 73

1  got up and went crazy as far as getting out of that
2  airplane by, you know, pushing you in front of each
3  other so that they could get out sooner.
4      I went down the stairs.  And I'm trying to
5  play it as it was.
6    Q.  You are talking about the internal stairs?
7    A.  The internal stairs.
8      When I got to the point where I had to turn
9  from the internal towards the door, it was like a mob
10 of people trying to get out at the same time.  You
11 know?  And I just couldn't walk.  The same thing
12 happened to my husband.  We just couldn't walk,
13 because people were cutting in front of, you know, of
14 us (indicating).  We finally got our place and started
15 to go down.
16     I don't remember that there was a leader in
17 charge of telling, you know, us, in the process of
18 getting out, either, "Can I help you," or either, "Be
19 careful," or anything like that.
20   Q.  All right.  Did --
21   A.  So we were -- we were on our own, fighting
22 with the other people that were trying to push and --
23 just to get out.
24   Q.  Did any other passenger actually make
25 contact with you while you were still in the airplane

19 (Pages 70 - 73)

Page 110

1 were between them?
2   A.  At the most, two steps.
3     MR. MARKS:  At what point?
4     MS. LAMBERT:  Just before he fell.
5     THE WITNESS:  One step, two steps.
6     Again, everybody was rushing to get out
7 there so fast that they were pushing and
8 everything. So I'm sure that it was very close,
9 not more than one, at the most two steps because
10 everybody -- because of the rush of getting out,
11 and the pushing and the getting -- trying to get
12 out.
13 BY MS. LAMBERT:
14   Q.  Okay. But you testified before you didn't
15 see anybody push your husband on the staircase; is
16 that correct?
17   A.  I did not see anybody push him, but there
18 is a possibility he might have been pushed. There is
19 a possibility that somebody made him trip. You know?
20 The ones that were trying to get by.
21     That's all I can assume, or...
22   Q.  All right. Well, I don't want to talk
23 about assumptions. I just want to know the facts and
24 what you saw.
25     So you didn't see anybody push your

Page 111

1 husband; is that correct?
2   A.  I did not see anybody, but it might be a
3 possibility.
4   Q.  Did you see anybody try to pass your
5 husband on the staircase, the external staircase?
6   A.  There were people trying to pass us,
7 constantly, even me, you know, trying to get out. So
8 if they passed me, they probably passed by my husband.
9   Q.  All right. But I don't want to talk about
10 probably. I want to know what you saw.
11     Did you see anybody try to pass your
12 husband going down the external staircase?
13   A.  Yes.
14   Q.  So was there somebody on his right-hand
15 side?
16   A.  Yes.
17   Q.  So was there somebody abreast of him going
18 down the staircase?
19   A.  I don't know if they were abreast of him.
20 I know that they were making their way down the
21 stairs.
22   Q.  Did you see any other passenger touch his
23 bags?
24   A.  No, ma'am.
25   Q.  Did you see whether there were any

Page 112

1 passengers immediately in front of your husband?
2   A.  No, I didn't see that.
3   Q.  I think this was asked and answered. Did
4 anybody else fall on the staircase when your husband
5 fell?
6   A.  After my husband fell?
7   Q.  Or when your husband fell?
8   A.  No. Right after this happened, they
9 stopped anybody from coming down the stairs.
10   Q.  So your husband was the only one who fell
11 down the staircase; is that correct?
12   A.  Yeah, but we were, like, one of the first
13 few. Not too many people.
14   Q.  You're saying that your family was one of
15 the first few that went down the staircase after he
16 fell?
17   A.  I would say about 30 or 40 people ahead of
18 us, maybe.
19   Q.  All right.
20   A.  Considering there were, what, 300-and-some
21 or maybe 400 people --
22   Q.  Okay.
23   A.  -- on the airplane.
24   Q.  Did your husband make any sound when he
25 fell, like screaming, or anything like that?

Page 113

1   A.  I couldn't tell you. I couldn't tell you.
2     I screamed, I know that.
3     MR. MARKS:  You already talked about
4   that.
5 BY MS. LAMBERT:
6   Q.  Can you tell me approximately how far down
7 your husband was down the staircase when he fell?
8     MR. MARKS:  Didn't she already answer
9   that?
10     MS. LAMBERT:  I don't remember.
11     MR. MARKS:  Yes, I'm sure she did.
12 BY MS. LAMBERT:
13   Q.  Do you recall? Does this picture help you,
14 Exhibit 7?
15   A.  That's why I went back to the picture.
16     I'll say that perhaps midpoint somewhere.
17   Q.  Did you talk to anybody from Air France
18 when you arrived back in Miami?
19   A.  Back in Miami?
20   Q.  Yes.
21   A.  No.
22   Q.  Did anybody help you through immigration or
23 customs from Air France?
24   A.  No.
25     MR. MARKS:  All right. Go ahead.

29 (Pages 110 - 113)

Page 114

1     MS. LAMBERT:  I think I'm almost done.  I
2  just want to go through my notes.
3     MR. MARKS:  Really?
4  Off the record.
5  (Discussion off the record.)
6  BY MS. LAMBERT:
7     Q.  All right.  When you came back to Miami,
8  did you return to the house where you and your husband
9  lived?
10     A.  Yes.
11     Q.  Did anybody stay there with you?
12     A.  My son stayed for a couple of days, and
13  then my daughter would occasionally come and stay with
14  me.  But the rest of the time, I was -- I wanted --
15     I was there by myself, and I wanted to be
16  there by myself.  I wanted to mourn.
17     Q.  I understand your family opened up a
18  probate case in Miami; is that correct?
19     A.  What do you mean by "probate case"?
20     THE WITNESS:  Steve, what is a probate
21  case?
22     MR. MARKS:  Yes, I did that for you.
23  Remember, that is where you were appointed
24  personal representative?
25     MS. LAMBERT:  Personal representative.

Page 115

1     MR. MARKS:  There was a document in the
2  court --
3     THE WITNESS:  Okay, okay.
4     MR. MARKS:  -- and Jackie and Johnny were
5  co-personal representatives.
6  BY MS. LAMBERT:
7     Q.  Okay.  So you and your two children were
8  appointed co-personal representatives of the estate?
9     A.  Yes.
10     Q.  Do you have any plans to return to work at
11  Baptist?
12     A.  I guess I have to.
13     Q.  When are you planning to return?
14     A.  Soon.  As soon as the doctor says that I
15  can handle my functions.
16     Q.  All right.  Are you looking forward to
17  going back to work?
18     A.  In a way.
19     Q.  What do you do with your time now?  Like,
20  what is your day like today?  Not today, because
21  you're giving a deposition.
22     MR. MARKS:  Obviously.
23  BY MS. LAMBERT:
24     Q.  But what is your typical day like today?
25     A.  Well, I don't go out a lot, don't socialize

Page 116

1  a lot.
2     On a typical day, I would get up and play
3  with the dogs at the house, which have been a great
4  help to me.  You know?
5     And if I had to go to the supermarket to
6  get something for myself, I would do that.  And for
7  the most part, you know, take a look at the bills that
8  I had to pay.
9     And by the evening, after we have dinner at
10  the house --  You know, sometimes I help to pick up
11  one of the kids, my granddaughter, you know, if my
12  daughter is busy, which is just a short drive.  And
13  after dinner, we would sit and watch TV, a movie or
14  something like that.  That's about it.
15     Q.  All right.  Did you and your husband
16  socialize a lot with friends before his accident?
17     A.  We used to be involved in a lot of
18  community activities, like the American Cancer Society
19  and, you know, the Cuban Museum, and different
20  activities, like the Mount Sinai President's Club.
21  But lately, you know, we were just taking it a little
22  bit more easy and not as frequent as before.
23     Q.  Have you engaged in any of the community or
24  charity activities since your husband died?
25     A.  No.  The only thing I really wanted to do,

Page 117

1  and I'm planning to do, was become a member of the --
2  what is it -- the Pinecrest Community Center, where I
3  could go and do some exercise, or yoga, or something
4  that would keep me entertained.
5     Q.  Okay.
6     A.  At my pace, in my...
7     Q.  Have you joined the Pinecrest Community
8  Center?
9     A.  I have had a problem in getting myself
10  motivated.
11     Q.  I take it that you drive a car?
12     A.  Yes.
13     Q.  Have you had any problems driving a car?
14     A.  No.  I'm a safe driver.
15     Q.  Okay.
16     A.  I've never had any problems.
17     Q.  Are there any other things you have
18  problems with motivation, getting yourself to do; any
19  other activities that you used to enjoy that you just
20  don't enjoy anymore?
21     A.  Well, I have a problem in getting myself
22  motivated to do many things, other than perhaps go to
23  the grocery, which I need to do.  Or a movie, which
24  is, of course, entertaining.
25     But I don't feel like being a lot around

30 (Pages 114 - 117)

Page 118

1 people. Everybody has been wonderful to me. It's
2 just that I don't have the motivation. You know?
3      I miss my husband. He was my partner for
4 54 years. And sometimes I feel he's here and I want
5 to feel that he's there with me, but he's physically
6 not there with me anymore. You know?
7   Q.   Okay.
8   A.   A lot of adjustment with leaving my house,
9 moving to my daughter's house, adapt to a complete new
10 life. I mean, those things have taken a toll on me.
11 You know?
12   Q.   If you go back to work and start earning an
13 income again, do you think that you will continue
14 living with your daughter, or do you think you might
15 find a place to rent on your own?
16   A.   I have not crossed that bridge yet.
17   Q.   All right.
18   A.   I have not. I --
19      Actually, being with the company of my
20 daughter and the kids, it's, to a certain extent,
21 entertaining. You know? I mean, keep me not alone.
22   Q.   It's comforting?
23   A.   Yes.
24   Q.   And I assume your family offers you
25 support, emotional support?

Page 119

1   A.   Oh, yes, mm-hmm. They've been behind me
2 all the way, all the time.
3   Q.   Do you have any close friends that you
4 socialize with?
5   A.   I have friends, but not that I wanted to be
6 out to have lunch or -- No. That's not for me.
7      I've lost 51 pounds. You know? I just
8 didn't feel like eating. I mean, I couldn't -- I
9 couldn't think of this going down, food going down.
10 You know?
11   Q.   Did you suffer from any health problems
12 because of your weight-loss?
13   A.   No. I went to my physician last week, and
14 he took blood tests, and he said everything is, you
15 know, okay.
16   Q.   Did you have any health benefits from
17 losing weight?
18   A.   Yes.
19   Q.   Okay.
20      MR. MARKS: Health benefits, did you say?
21      MS. LAMBERT: Health benefits, yes.
22 BY MS. LAMBERT:
23   Q.   Are you continuing to lose weight, or has
24 that stabilized?
25   A.   I haven't weighed myself, like, for the

Page 120

1 past week or so. I don't feel heavier.
2   Q.   I'm going to ask you a very general
3 question, now. Is there anything else about the loss
4 of your husband that you wanted to tell me about how
5 it has affected you, that we haven't already
6 discussed?
7   A.   He was my husband for 54 years. And,
8 again, I said it, I miss him. He -- Overlooking the
9 financial aspects that he gave me. We were very
10 close. We had a good relationship, a good
11 companionship. And, you know, it has been really
12 devastating for me.
13   Q.   Have you traveled outside of the South
14 Florida area since your husband died, once you got
15 back here?
16   A.   Once I went to spend a couple of days with
17 my son in St. Augustine. That's all.
18   Q.   Do you have any plans for any future
19 cruises or travel with your family?
20   A.   Hopefully, that will happen eventually,
21 yes.
22   Q.   But there are no concrete plans right now?
23   A.   No, not at all.
24      MS. LAMBERT: That's all I have. Thank
25 you very much.

Page 121

1      MR. MARKS: Sonia, I have just a few
2 questions.
3         CROSS-EXAMINATION
4 BY MR. MARKS:
5   Q.   You mentioned that you saw your husband
6 ahead of you, but some bodies obstructed your view as
7 you were going down the stairs, correct?
8   A.   Yeah.
9   Q.   You said you saw your husband with his left
10 hand on the rail?
11   A.   Yes.
12   Q.   Carrying his bag?
13   A.   Yes.
14   Q.   And that people were trying to get by him?
15   A.   Yes.
16      MS. LAMBERT: Objection, form.
17 BY MR. MARKS:
18   Q.   You said there was no one directing or
19 managing traffic at the top of the stairs, correct?
20   A.   Nobody.
21      MS. LAMBERT: Objection to form.
22 BY MR. MARKS:
23   Q.   Was there anyone directing or managing
24 traffic at the bottom of the stairs -- or managing
25 traffic on the staircase, at the bottom of the stairs?

31 (Pages 118 - 121)

Page 122

1    A.   It was hard for me to see that because I
2  was still up, but I don't think there was, because
3  otherwise there would have been a little bit more
4  organized scenario than it was.
5    Q.   You mentioned that there was only one
6  staircase when you all were deplaning --
7    A.   Correct.
8    Q.   -- for the whole 747?
9    A.   Yes.
10   Q.   And that the flight was delayed?
11   A.   Oh, yeah.  That is why everybody was
12 rushing and pushing to get to the buses for their
13 connections.
14   Q.   Other than the lack of management of the
15 traffic at the top of the stairs, other than the lack
16 of management of the traffic at the bottom of the
17 stairs, other than people pushing and shoving and
18 rushing because the flight was delayed, and other than
19 what you've learned later was the strips that were
20 missing on the staircase, is there anything else from
21 what you observed that could have contributed to your
22 husband's fall?
23       MS. LAMBERT:  Objection, form.
24       THE WITNESS:  I think that there was a
25   total lack of organization to the procedure of

Page 123

1    debarking [sic], from not making an announcement
2    as far as:  We have arrived and there is going
3    to be a staircase.
4        Perhaps they could have even said,
5    passengers with a connection should proceed to
6    disembark first.
7        There was, like, no leadership, other
8    than their standard procedure to have somebody
9    inside the plane saying, "Have a nice flight,"
10   but nobody to help coach -- to assist in any
11   way, shape, or form the mob that was
12   disembarking and pushing to get off the plane.
13   Nobody.
14 BY MR. MARKS:
15   Q.   Okay.  Other than those things --  From
16 what you observed, is that what caused, in your
17 opinion, your husband to fall?
18   A.   It had to be, Steve, because my husband and
19 I, like I have pointed out before, are seasoned --
20 well, were seasoned travelers.  We traveled quite a
21 bit, to many places.
22       My husband was a cautious person.  He was
23 in perfect health to not have been able to, you know,
24 watch himself.  So I have to think that all those were
25 contributing factors.

Page 124

1    Q.   Was your husband able to get down the
2  stairs from the upper deck of the 747 to the main deck
3  of the 747 carrying his bag without any difficulty?
4    A.   You mean from out the door?
5    Q.   No.  From the top deck where your seats
6  were --
7    A.   Oh, you mean the first one.
8    Q.   -- was he able to navigate down those
9  steps --
10   A.   Yes.
11   Q.   -- without any difficulty?
12   A.   Yes.  And still with his carry-on and all
13 of that.
14   Q.   Which steps were more difficult to
15 navigate, the ones inside the plane, or the staircase
16 that was driven up to the plane?
17   A.   Inside the plane was difficult because it
18 was narrow and steep.
19       But once you faced the --  At least this is
20 my experience, what I can say.  When I walked out the
21 door and I saw that metal staircase and I looked down,
22 I said, "Ooohhh, this is a big stair."
23       And, you know, in their own particular
24 ways, both staircases offers some sort of danger.  You
25 know?

Page 125

1        MR. MARKS:  I appreciate your answering
2    those questions.  Nothing more.
3        THE WITNESS:  Thank you.
4        MR. MARKS:  We will read, not waive.
5        MS. LAMBERT:  Okay.
6        MR. MARKS:  You are free to go.
7        MS. LAMBERT:  Thank you very much.
8        (Thereupon, the taking of the deposition
9  was concluded at 1:38 p.m.  Signature and
10 formalities were not waived.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 - 125)

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

# Exhibit G

OCCUPATIONAL SAFETY AND HEALTH SERVICES, INC.
6320 LIMERICK LANE
EDINA, MINNESOTA
55439

In the Matter of: *Delgado v. Delta Air Lines, Inc.*

## INTRODUCTION:

I have been asked to determine from a safety engineering perspective whether Juan Delgado's death was a result of Air France's conduct.  I have also been asked to analyze whether his own actions when disembarking the 747 aircraft were reasonable from a safety perspective when considering all of the factors surrounding his death.  In performing this analysis, I have reviewed the practices and procedures employed by Air France relating to the disembarkation process and the maintenance of the passenger stairs.  I intend to opine that Air France's conduct relating to both fell below a reasonable standard of care.

To determine the injury/incident scenario, to determine what went wrong, and, whether with reasonable care, the incident was preventable, I have used the theory of accident/incident reconstruction. This method includes considering all factors which could have caused an accident/injury, and making a decision based on safety engineering as to what was the likely cause of the accident/incident. The methodology I employ has been taught in universities and colleges as an approved methodology to analyze injuries/accidents/incidents. I have attached hereto my curriculum vitae which outlines my experience and expertise.

In conducting my analysis, apart from relying on my experience and expertise, I have reviewed the following documents and evidence:

1. Depositions taken thus far in this litigation (i.e. those of the Delgado family and various employees of Air France), including exhibits.
2. The Complaint which was filed in this matter.
3. A full copy of the French Gendarmerie Nationale Investigative report, with various portions translated to English.
4. ISO 12056
5. TLD ABS-580 Vehicle Daily Check
6. Exemplar of ABS-580 step, provided by Air France.
7. Various safety standards relating to walking surfaces published by the American National Standards Institute, the International Standards Organization, and the American Society for Testing and Materials.

## RELEVANT FACTS OF THE INCIDENT:

Juan Delgado was born June 24, 1931, and was a passenger traveling from Miami to Paris aboard Delta G3RDDN, Boeing 747-400, and Ticket No. 00621989098920 (Air France Flight No. 695) on May 31, 2012. The subject flight landed, behind schedule, at Charles de Gaulle airport. The aircraft did not park at a normal gate with a jet-way, but rather a remote spot on the tarmac.

Passengers on the subject flight were required to disembark the aircraft through only one exit an on only one portable staircase. The gateway used was a TLD ABS-580, self-propelled passenger stairs. The stairs were owned and maintained by Air France.

Because the aircraft was late arriving at Charles de Gaulle airport, many passengers rushed down the stairs during disembarkation of the flight in order to board their connecting flight. While disembarking the subject flight, Mr. Delgado was caught in the middle of a fast moving and congested sea of passengers and fell.

Juan Delgado landed on the tarmac head first and was rushed to a local hospital. Shortly after arriving at the hospital, doctors determined Juan Delgado no longer had any brain function due to the head injury he sustained while disembarking the subject flight. According to Mr. Delgado's autopsy report, the "death was the result of a diffuse subdural hematoma with meningeal hemorrhage and cerebral contusion of traumatic origin. There is a right occipital ecchymotic contusion with related fracture of the squama occipitalis. Injuries are compatible with a fall. There is no other trauma- or violence-related injury."

In the Gendarmerie report, it is noted that Step No. 8, counting from the bottom, had all of the non-slip tape missing (i.e., 143 cm). It is also noted that Step No. 11, where Mr. Delgado's fall was observed to initiate, was missing a portion measuring 58 cm length of the non-slip tape.

In addition to the above-recited facts, the information I was provided includes both testimony and documentation relating to Air France's procedures for disembarkation at the Charles de Gualle Airport. I will cite to specific areas of this testimony and information herein.

## SUMMARY OF OPINIONS:

1.  Air France did not have adequate documented procedures for safe passenger disembarkation.

2.  Air France did not have adequate procedures for the maintenance of the passenger stair surfaces.

3.  Mr. Delgado's fall was more likely than not caused by an unsafe condition created by Air France, in that his fall resulted from: 1.) jostling passengers on the stairs during disembarkation; and/or, 2.) the lack of anti-slip tape on Step no. 11.

## AIR FRANCE'S DISEMBARKATION POLICIES:

One of the key factors in a safety engineering analysis is a review of the procedures employed in the use of a device, such as the ABS-580 self-propelled passenger stairs. In my experience as a safety engineer, I have been often-times tasked with analyzing the practices and procedures employed by users of devices, such as stairs, to determine whether the device is safe. Even if a manufacturer designs a safe device, if it is used in an unsafe manner, the device itself becomes

unsafe. Thus, a key role in safety engineering is creating the instructions necessary for the proper use of a device.

In my opinion from a safety engineering perspective, the ABS-580 stairs were a dangerous device when Air France personnel allowed passengers to descend in a rushed and chaotic manner, which was exacerbated by the late-arriving aircraft. This dangerous condition was caused by Air France's improper procedures to educate its employees to avoid this situation. I have reviewed all of the documented procedures provided by Philippe Gontier, the person in charge of the methods and procedures for the Roissy Charles de Gualle hub. I have also reviewed Mr. Gontier's deposition testimony. Consistent with his testimony, I found no procedure which relates to the monitoring of passengers during disembarkation: In fact, I found discrepancies between what each department—flight crew versus ground crew—is tasked with during disembarkation, thus adding to the dangerousness of the subject stairs as used by Air France.[1] Air France employee, Chrystele Diveu, acknowledged during her deposition the tendency of human nature to rush in a situation like a late-arriving aircraft that was forced to disembark at a remote terminal. With such recognition, Air France should have specifically trained its employees to properly manage the passenger flow during disembarkation, and to be extra vigilant when the aircraft was delayed in its arrival.

This lack of safe procedures either fully caused, or heavily contributed to, Mr. Delgado's death. Mr. Delgado's family described the scene as they were descending the stairs as chaotic and rushed, were passengers were jostling each other as they descended the stairs. There is no testimony in the record that refutes or contradicts this testimony. It is more likely than not that Mr. Delgado was inadvertently pushed or shoved in this process. Even if Mr. Delgado was not pushed or shoved, however, it is certain that the rushing passengers forced Mr. Delgado to descend the stairs at an unsafe rate of speed. If Air France would have properly trained its personnel to control the passenger flow during disembarkation (which the chief purser of this flight admits he did not do), then this accident would have been avoided altogether.

If called to testify in this matter, I intend to offer expert testimony on what practices and procedures should have been employed by Air France to ensure that passengers were not injured during the use of ABS-580 stairs. I will also testify as to why it is imperative that such procedures are documented in written form. Finally, as would be necessary to such an analysis, I would testify as to the procedures that were in place at the time of Mr. Delgado's fall and how such procedures were deficient, in that they allowed for the situation which caused his death.

---

[1] Mr. Gontier claims that ground crew personnel are taught procedures for monitoring disembarkation during training. He has not ever attended a training class, spoken with the trainers about their course material, or otherwise verified that such procedures are in fact covered during training. This is another example of Air France's failure to properly train its personnel for the safe use of the passenger stairs.

## **AIR FRANCE'S MAINTENANCE PRACTICES:**

Another area that is lacking in Air France's operational practices is the maintenance protocol employed by the company relating to the ABS-580 self-propelled stairs. Mr. Gilles Papin, the individual in charge of the Ground Equipment Division for Air France, testified that the company employs a daily check of the surface area of the stairs. It is important to note that the procedures to which Mr. Papin referred do not specifically require that the ground crew to check the quality of the anti-slip strip located on each step. Instead, it generally states that the ground crew should "secure the equipment and start the repair if . . . poor condition of a step [is noticed]." The TLD recommended daily checklist specifically requires that ground crew "check the no-skid coating," however. The importance of this anti-slip material is highlighted in the International Standards Organization guidelines for Aircraft — Self-propelled passenger stairs for large capacity aircraft — functional requirements, document number 12056. The ISO guidelines specifically require that the stair tread "be of non-skid/anti-slip quality." In exposing its passengers to the defective stairs, Air Frances subjected passengers to an unreasonably safe condition of which it knew, or should have known, and had the ability to prevent.

To further compound the improper written procedures, Mr. Papin testified that even if the ground crew would identify that the anti-slip material was missing during a daily check, they were trained to ignore it. Instead, Air France would continue to use the stair in the unsafe condition. This procedure is in direct contradiction to well-established safety procedures. The American National Standards Institute has promulgated multiple safety guidelines which describe the requirements for surface areas to which the public are exposed. The International Standards Organization has adopted similar (if not exact) requirements. According to these standards, the entity which exposes public to various walking surfaces has a duty to ensure that there are sufficient no-slip surfaces, and in the absence of such surfaces, that there are adequate warnings signs to put the public on notice of the dangerous condition. In this case, the chief purser of Flight 695 admitted that he, being the person in charge of the flight, did not issue any such warning. Nor is there any evidence that the stairs had any warning signs to put the public on notice of the dangerous condition of the stairs.

The missing anti-slip strip, and lack of related warning, exacerbated the dangerous condition of the stairs. With the rush of passengers off the aircraft, it was imperative that all step surfaces be maintained in a safe condition—Air France ignored this requirement.

Lewis Barbe
Registered Professional Engineer,
State of California,
License Number SF 717
Expiration March 31, 2015.

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

# Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 12-CV-23272-Graham/Goodman

SONIA DELGADO, JUAN ENRIQUE
DELGADO & JACQUELINE CABRERA,
as co-Personal Representatives
of the Estate of Juan Delgado,
Deceased,

   Plaintiffs,

-vs-

DELTA AIR LINES, INC.,

   Defendant.

_____/

       701 Brickell Avenue,
       Suite 3000,
       Miami, Florida,
       Thursday, 10:00 a.m.,
       July 11, 2013.

D E P O S I T I O N

of

BRIAN C. GRIESER, P.E.
taken on behalf of the Plaintiffs
pursuant to a Notice of Taking Deposition
Duces Tecum

—  —  —

BRUMM, VEGA & ASSOCIATES, INC.   (305) 374-3340

Page 86

1        A.   --would cause him to lose his balance.

2        Q.   --that is one of the things you include in your

3   report.   Correct?

4        A.   That's one.   Yes.

5            And you can't rule out that the next person

6   ahead of him didn't inadvertently kick the back of his

7   suitcase.   You know, that's a possibility.

8            So, there's some external possibilities, as

9   well.

10       Q.   You also didn't rule out that the design of the

11  staircase, apart from the slip resistance of the tread,

12  contributing to his fall in any way.   Correct?

13           MS. LAMBERT:   Objection.   Form.

14       A.   I'm sorry.   Repeat that question.

15           (The question referred to was read by

16       the reporter as above recorded.)

17       A.   Well, I didn't see any recognized trip hazards.

18  I mean, the tread, at least based on my inspection of the

19  exemplar tread, doesn't present any recognized trip

20  hazard, but--let's see, I'm not aware of any other

21  characteristics of the stairway that could cause

22  someone's fall beyond that of a regular stairway.

23           I mean, some of the information I don't have.

24  Like, for example, the dimensional uniformity.

25  BY MS. VALDIVIA:

# Plaintiffs' Exhibit in Support of Their Motion for Partial Summary Judgment

## Exhibit I



delta.com    My Trips    Earn Miles

## YOUR ITINERARY AND RECEIPT

**Scan this barcode at a Delta Self-Service Kiosk** to access your reservation.

**Please review this information before your trip.**
If you need to contact Delta or check your flight information, go to delta.com, call 1-800-221-1212. For a complete list of worldwide phone numbers, please visit www.delta.com/contact _us.

Changes to Award Tickets must be made at least 72 hours prior to the departure time of the flight being changed. Award Tickets booked within 72 hours of departure are nonrefundable and cannot be redeposited or reissued unless prohibited by local law. You can exchange, reissue and refund eligible electronic tickets at delta.com.

You can check in for your flight up to 24 hours prior to departure time. Check in online by clicking the link below or download the Fly Delta app here. You can also use the app to change seats, track your bag, view your flight status and so much more.

**Thanks for choosing Delta.**
Flight Confirmation #: **G3RDDN** | Ticket #: **00621989098920**

**CHECK IN ONLINE  >**

## Your Flight Information

| Wed 30MAY | | | | |
|---|---|---|---|---|
| LV 5:50pm | MIAMI | AR 8:25am ** | PARIS-DEGAULLE | **AIR FRANCE 695** (X) Confirmed Breakfast |

| Thu 31MAY | | | | |
|---|---|---|---|---|
| LV 9:35am | PARIS-DEGAULLE | AR 11:15am | BARCELONA | **AIR FRANCE 1348** (X) Confirmed |

| Sat 16JUN | | | | |
|---|---|---|---|---|
| LV 11:40am | BARCELONA | AR 3:50pm | ATLANTA | **DELTA 115** (N) Confirmed Lunch |
| LV 5:45pm | ATLANTA | AR 7:53pm | MIAMI | **DELTA 1873** (N) Confirmed |

**Arrival date is different than departure date.

2

## Your Flight Details    Manage Trip ›

| Passenger Details | Flights | Seats |
|---|---|---|
| **JUAN DELGADO** | AIR FRANCE 695 | Not Assigned |
| ›Add SkyMiles # | AIR FRANCE 1348 | Not Assigned |
| ›Join SkyMiles | DELTA 115 | Not Assigned |
| | DELTA 1873 | 9E |

## Receipt Information

### Billing Details

| Passenger: | Payment Method: | Ticket Number: |
|---|---|---|
| **JUAN DELGADO** | | **00621989098920** |
| | Org FOP Free | FP A/C/TL67669.92 |
| | | Org Tkt 00608735463766 |

| FARE: | USD | |
|---|---|---|
| Taxes/Carrier-imposed Fees: | **68.10** | |
| **Total:** | **68.10 USD** | |

VALID ON DL/SM OAL/PNLTY FOR CHGS

This ticket is non-refundable unless issued at a fully refundable fare. Any change to your itinerary may require payment of a change fee and increased fare. Failure to appear for any flight without notice to Delta will result in cancellation of your remaining reservation.

Note: When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply and are displayed in the sections below.

## Mileage Details

Original Mileage: 92500

Note: When using certain vouchers to purchase tickets, remaining credits may not be refunded. Additional charges and/or credits may apply and are displayed in the sections below.

Medallion® status listed reflects a member's status at the time of ticketing, which may differ from the actual status at the time of flight departure.

This ticket is non-refundable unless issued at a fully refundable fare. Any change to your itinerary may require payment of a change fee and increased fare. Failure to appear for any flight without notice to Delta will result in cancellation of your remaining reservation.

## Ticketing Details

| Passenger: | Ticket #: | Place of Issue: | Issue Date: | Expiration Date: |
|---|---|---|---|---|
| JUAN DELGADO | 00621989098920 | SLCRES | 03MAY12 | 02MAY13 |