UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-CV-23272-GRAHAM/Goodman

SONIA DELGADO, JUAN ENRIQUE
DELGADO and JACQUELINE CABRERA,
as Co-Personal Representatives of the Estate
of Juan Delgado, Deceased,

        Plaintiffs,

vs.

DELTA AIR LINES, INC.,

        Defendant.
_____/

## PLAINTIFFS' RESPONSE TO DELTA'S STATEMENT OF FACTS

5.    Plaintiffs do not disagree that Mr. Delgado sustained a head injury. According to the Gendarmerie report, the cause of death was a "diffuse subdural hematoma with meningeal hemorrhage and cerebral contusion of traumatic origin." Certified Translation of Gendarmerie Report, Ex. 12, attached hereto as Exhibit "A."

7.    Plaintiffs also contend that Delta's code-share partner, Air France, was negligent in its maintenance of the portable stairs that it forced its passengers to use for the disembarkation of Flight 695. Two of the steps, the eighth and eleventh from the bottom, were missing the black, anti-skid strip at the leading edge. Plaintiffs' experts opine that this missing anti-skid strip, along with the jostling passengers, caused Mr. Delgado's fall. Certified Translation of Gendarmerie Report, Ex. 2, attached hereto as Exhibit "B"; Reports of Lewis Barbe, Plaintiffs' Safety Engineering Expert, attached hereto as Exhibit "C"; Reports of Manuel Raefsky, Metallurgical Safety Engineer, attached hereto as Exhibit "D"; Declaration of Lewis Barbe, attached hereto as Exhibit "E"; Declaration of Manuel Raefsky, attached hereto as Exhibit "F."

8. Plaintiffs are unable to respond to Delta's assertion in Paragraph 8. The alleged "fact" is missing a verb critical to understanding Delta's allegation. In any case, because relevant to the context of Delta's allegation, Plaintiffs respond: Mrs. Delgado testified at her deposition that she believed that the disorganized disembarkation, in which passengers were passing one another on the stairs, caused Mr. Delgado's fall. Excerpt of Sonia Delgado's Deposition, February 19, 2013, at 111:11–16 & 121:3–125:2, attached hereto as Exhibit "G."

9. Plaintiffs are unable to respond to Delta's assertion in Paragraph 9. The alleged "fact" is missing a verb critical to understanding Delta's allegation. In any case, because relevant to the context of Delta's allegation, Plaintiffs respond: Mrs. Cabrera stated in her statement to the Gendarmerie that "there were insufficient safety measures for exiting the plane and procedure to follow in order to go down." Certified Translation of Gendarmerie Report, Ex. 20, attached hereto as Exhibit "H." During her deposition, Mrs. Cabrera described a scene on the stairs where all passengers were bumping into one another. Excerpt of Jacqueline Cabrera's Deposition, February 21, 2013, at 64:16–21 & 73:13-16, attached hereto as Exhibit "I."

10. Plaintiffs are unable to respond to Delta's assertion in Paragraph 10. The alleged "fact" is missing a verb critical to understanding Delta's allegation. In any case, because relevant to the context of Delta's allegation, Plaintiffs respond: Both Alexander and Miranda Cabrera were still on the plane when their grandfather fell. Excerpt of Miranda Cabrera's Deposition, March 20, 2013, at p.24, attached hereto as Exhibit "J." During his deposition, Joseph Cabrera testified that he was not watching his grandfather during the disembarkation because he "was trying not to . . . trip and fall [him]self[, b]ecause everyone was . . . rushing out and bumping into each other." Excerpt of Joseph Cabrera's Deposition, March 20, 2013, at p.57:3–9, attached hereto as Exhibit "K."

14. Plaintiffs disagree that Ms. Jamy's statement includes the word "missed." Rather, the proper translation of the phrase "à glisser" is "slipped." Affidavit of Steve Cokov,

2

    Certified Translator, attached hereto as Exhibit "L."  In addition, another passenger told Mrs. Cabrera that Mr. Delgado slipped on the stairs.  Ex. I at 70:3–5.

16. Mrs. Cabrera testified at her deposition that she did not know how Mr. Delgado was carrying his luggage.  Ex. I at 47:4–6.  Mrs. Delgado testified that he was "carrying" his suitcases.  Ex. G at 109:20–23; 121:12–13.

18. Plaintiffs' re-allege here their response to Paragraph 16.

20. Chrystele Diveu, the flight attendant assigned to the Delgado's cabin, testified that she noted Mrs. Delgado having difficulty with her suitcases and offered assistance.  She did not, however, testify as to whether a cabin crew member has a "duty" to offer assistance to a passenger.  Instead she testified that in this specific instance, she did not note a reason to help them.  Excerpt of Chrystele Diveu's deposition, May 28, 2013, at 10–11 & 31–32, attached hereto as Exhibit "M."

21. Melanie Dussault, another member of the cabin crew, testified that as soon as she arrived at the scene on the tarmac, she berated Mr. Delgado's son for not assisting the man with his luggage.  She said that Mr. Delgado had urinated himself, there was blood under his head, and that it was obvious that the situation was critical.  Excerpt of Melanie Dussault's Deposition, May 28, 2013, at p.21:10–11, 21:18–22, 22:1–6, 23, attached hereto as Exhibit "N."

22. Ms. Jamy did not witness the initiation of the fall.  She stated that she saw him falling after hearing Mrs. Delgado scream.  Statement of Sarah Jamy, Gendarmerie Report, Document 22, attached hereto as Exhibit "O"; *see also* Ex. E at ¶ 25.

23. Mrs. Delgado testified that her husband was walking "normal, under the circumstances."  Ex. G at 109:20–21.  She has described the scene as a chaotic one.  Paragraph 8, *supra*.

3

26. Plaintiffs take exception to the description "bottom" of the aircraft, as it implies that Ms. Constatin was in a position to properly monitor the passengers on the stairs and on the tarmac at the same time. Piece number 4 of the Gendarmerie reports that she was responsible to cover the two areas at the same time, and had to select between viewing the bus area or the stairs. Gendarmerie Report, Part 4, at Exhibit "P."

27. The two flight attendants were positioned inside the aircraft, away from the door, in the galley area closest to the exit door. Ex. I at p.43; Ex.4 thereto, Picture of interior of the aircraft with a marking where purser was standing (F/A), attached hereto as Exhibit "Q." Ms. Dussault testified that it was the ground crew's responsibility to monitor the passengers as they descended the stairs. Ex. N at p.24:8–12. None of the Flight attendants could see down the stairs. Deposition of Phillipe Arnaud, May 28, 2013, at 25:15–19, attached hereto as Exhibit "R."

29. Mr. Arnaud could not see on the stairs. Ex. R at 25:15–19.

30. Ms. Diveu also described a scene where passengers tried to force their way over Mr. Delgado's body as he was laying on the tarmac. Ex. M at 19–20. Specifically she stated: "Some of the passengers were trying almost to force their way over Mr. Delgado's body to their buses." *Id.* When questioned about whether the passengers were upset that they were unable to deplane even "knowing that there was a gentleman on the ground with blood pooled on his head," Ms. Diveu responded "yes . . . passengers tend to have one thing on their minds, and that's making it onto the bus and successfully transferring to whatever other flights they might need to take." *Id.* at 20.

31. Ms. Dussault could not see on the stairs at the time of Mr. Delgado's fall, as she was standing on the other side from the door in the interior of the aircraft during disembarkation. Ex. N at 17:7–8.

34. That the exit door of the aircraft was 1.07 meters (approximately 42 inches) wide is irrelevant to the disembarkation flow of passengers on the staircase. The flight of the

4

staircase was 59 inches wide. Measurements of Self-Propelled Stairway, attached hereto as exhibit "S." Mrs. Delgado testified that passengers were passing Mr. Delgado while he was descending the stairs. Ex. G at p.111. Mrs. Cabrera testified that there was people side-by-side, and bumping one another trying to get down the stairs. Ex. I at 63–64.

35. Plaintiffs' re-allege here their response to Paragraph 34.

36. If the crew was aware that the passengers would disembark using stairs rather than an expected jetway, they should have offered assistance. Excerpt of Deposition of Lewis Barbe, Plaintiffs' Safety Engineer Expert, July 2, 2013, at p.200:3–18, attached hereto as Exhibit "T." Philippe Gontier testified "There's also a member of the cabin crew who stands on the top of the stairs on a little platform there and who makes sure that the passengers do, indeed, flow down the stairs but that cabin crew member does not descend the stairs his or herself." Ex. AA at 34:19–23.

37. Delta has not put forth any evidence that suggests that it is "regular and acceptable" to deplane a wide-body aircraft like the 747-400 using mobile staircases. Mrs. Wahrmund, Delta's proffered expert, has never flown on a 747-400 aircraft in a professional capacity, nor has she. Excerpts of Melanie Wahrmund's Deposition, July 9, 2013, at p.9, attached hereto as Exhibit "U." She also has never flown into Charles de Gaulle Airport. *Id.* at 6:21–24.

41. Neither Mrs. Delgado, nor her husband, had ever used a mobile passenger staircase for disembarkation of a 747-400 aircraft, nor had they ever used one at Charles de Gaulle airport. Declaration of Mrs. Delgado, Pls. SoF at Ex. A, D.E. 43-1, at ¶ 4.

44. The pilot report stated that the aircraft was twenty-two minutes later, but Mrs. Cabrera stated to the Gendarmerie that it was over forty minutes late. Ex. H at 2.

46. The Gendarmerie contacted all passengers on the aircraft and determined that the only passenger that could "bring . . . precision[] about the facts of interest" in this case was Sarah Jamy. Certified Translation of Gendarmerie Report, document 17, attached hereto as Exhibit "V."

48. The Gendarmerie also did not attribute the blame to Mr. Delgado for the fall. The Report does not indicate anywhere therein that it was the task of the investigation to place blame. *See* Declaration of Lyndall Lambert, D.E. 48.

49. Mr. Delgado fell from the eleventh step from the bottom of the staircase, and the defective condition of the step along with the jostling passengers, caused his fall. Pl. SoF at D.E. 43 ¶¶ 18–25.

52. The Gendarmerie also concluded that "according to witnesses, Mr. Delgado had already lost his balance before reaching the step that is the subject of our index 3" This is the eighth from the bottom, or 3 below where Plaintiff alleges Mr. Delgado fell. Ex. B at 5 ¶ 3 and Ex. P at Photo 3.

53. The Gendarmerie concluded that Mr. Delgado's fall had initiated before he reached the eighth step from the bottom. *Id.* Ms. Jamy's statement says that she saw Mr. Delgado "falling on the last steps of the stairs." Ex. O. Her statement does not include a reference to where Mr. Delgado's fall initiated. *Id.* Mrs. Delgado states that Mr. Delgado was on the eleventh step from the bottom. Pls. SoF, Ex. A, D.E. 43-1 at ¶¶ 12–14. The Gendarmerie included a pictorial reference to the place from which Mr. Delgado fell, and it was not on "the last steps." *See* Ex. P at Photo 3. Mrs. Constantin places Mr. Delgado around the eleventh step. Ex. B at p.5. Mrs. Delgado was closer to Mr. Delgado than Sarah Jamy when he fell. *Compare* Pls. SoF, Ex. A, D.E. 43-1, at ¶¶ 12–13 and Ex. O; Ex. E at ¶ 25.

54. The Gendarmerie statement says that the "presumed point of impact of the victim's skull is immediately at the foot of the ramp." Ex. B at p.6. They do not suggest that this is where his body first fell. *Id.*

58. Plaintiffs' experts Lewis Barbe and Manuel Raefsky both opined that the stairs were in an unreasonably dangerous condition for its intended use and should not have been used with the missing black, anti-skid tape or in the situation with a chaotic disembarkation. Exs. C–F.

59. Plaintiffs' expert, Lewis Barbe, testified that the eleventh step from the bottom was not slip resistant. Ex. T at p.180–82.

60. Plaintiffs' re-allege here their response to Paragraph 59.

61. Plaintiffs' re-allege here their response to Paragraph 59.

63. This is irrelevant to Plaintiffs' theory. Exs. E–F.

65. Testing was not required for Mr. Barbe to render his opinions; rather, his opinions are based on his 50 years of experience as a safety engineer. Ex. E at ¶ 27.

66. Testing was not required for Mr. Raefsky to render his opinions; rather, his opinions are based on his 50 years of experience analyzing surface areas from a safety perspective. Ex. F at ¶ 6.

67. There is no indication that the basis for this theory, reduced mobility and strength, applies to Mr. Delgado. Deposition of Brian Grieser, July 11, 2013, at 55:22–62:16, attached hereto as Exhibit "W." There is no evidence that Mr. Delgado had any difficulty ascending or descending stairs. *Id.* Mrs. Delgado testified that Mr. Delgado was limber

**PLAINTIFFS' ADDITIONAL STATEMENT OF FACTS**

Plaintiffs filed their statement of facts along with their Motion for Partial Summary Judgment, and for sake of brevity are not repeating it here. [D.E. 43]. To address issues raised in Delta's Motion for Summary Judgment, Plaintiffs add the following:

30. It is a central tenant of slip/trip and fall investigations that accidents occur because of a change in condition. Ex. E at ¶ 13.

31. Mr. Delgado had descended safely down 14 steps and fell when he came to the location where the anti-skid tape was missing. Ex. E at ¶ 13.

32. The thing most likely to have caused Mr. Delgado's fall was a factor external to him. Ex. E at ¶¶ 18–20.

33. Mr. Delgado's fall was most likely caused by the change in circumstance that he encountered in either the missing anti-skid tape or because of being pushed by another passenger. Ex. E at ¶ 19.

34. Plaintiffs have advanced a theory that Air France was negligent in the procedures it established for both passenger disembarkation and maintenance procedures. Ex. E at ¶ 20.

35. The ground crew did not properly inspect (or did and ignored) the condition of the black, anti-skid tape on the eleventh step. Ex. E at ¶ 20–21.

36. The ground and flight crew did not adequately monitor passenger flow control on the stairs during disembarkation. Ex. E at ¶ 20 & 22.

37. Mr. and Mrs. Delgado were seasoned travelers. Ex. G at 72:4–10.

38. The Chief purser of the flight said that he did not feel it was necessary to issue warnings about the use of stairs on this flight. Ex. R at p.24:11–14. Mrs. Delgado did not hear any warning about the use of stairs, and did not know that they would be using stairs until they were outside of the aircraft. Pls. SoF at ¶ 22, D.E. 43-1.

39. Plaintiffs' experts both opine that the black, anti-skid strip missing from the eleventh step rendered the step unreasonably dangerous. Ex. D at p.15; Ex. C at ¶ 7; Ex. F at ¶ 9-10.

40. Plaintiffs' experts both opine that Air France's published maintenance procedures (which are part of this record) were unreasonably deficient. Ex. E at ¶ 20; Ex. D at p.16; Ex. F at ¶ 14.

41. The maintenance procedures for this staircase did not specifically require the ground crew to check for the presence of the anti-skid tape on each step before every use. Ex. C; Ex. E at ¶ 28; Ex. D at p.5; Ex. F ¶ 14.

42. The person in charge of ground equipment at Charles de Gaulle airport testified that if the ground crew would have noted the missing strip before Flight 695, they were not taught to take that staircase out of operation to repair the condition. Ex. C at p.4; Ex. E at ¶ 28.

43. Plaintiffs' safety engineer expert, Lewis Barbe, rendered his opinion that the stairs were unreasonably dangerous. Ex. E at ¶ 21.

44. Mrs. Warhmund stated that she was not rendering an opinion on causation. Ex. U at 63:14–16. Mr. Grieser also testified that he is not rendering an opinion as to what caused Mr. Delgado's fall. Ex. W at 90:6.

45. Mr. Grieser said that instead of slipping, it was more likely that "perturbations" caused Mr. Delgado's fall. When pressed on what those "perturbations" were, Mr. Grieser admitted that he could not rule out an external cause to Mr. Delgado's fall. *See* Excerpt

of Report of Brian Grieser, attached hereto as Exhibit "Y"; *see also* Ex. W at 86:5–7, 90:6–9.

46. Up until right before the trip Mr. Delgado actively coached softball.  Ex. G at p.29:6–14.

47. Mr. Delgado was in great health at the time of the Flight.  Ex. G at p.27:15–17.

48. There is no evidence that Mr. Delgado's shoes were lose.  *See* Ex. W at 65:6–72:2. There is no evidence that this caused or contributed to his fall.  *Id.*  It is common for shoes to come off in accidents of this nature do to the force of falling.  Ex. C at p.9.

49. Mr. Grieser does not say that dragging Mr. Delgado's luggage caused Mr. Delgado's fall. Ex. W at 89:3–5.

50. Mr. Grieser also could not rule out Air France's Negligence.  *Id.* at 87:9–88:16.  Mrs. Warhmund only addresses the Flight Crew's negligence and not the ground maintenance or ground crew.  Report of Melanie Wahrmund, attached hereto as Exhibit "Z."

Dated: July 26, 2013                    Respectfully submitted,

/s/ Steven C. Marks
Steven C. Marks (FBN 516414)
smarks@podhurst.com
Lea P. Valdivia (FBN 84763)
lvaldivia@podhurst.com
**PODHURST ORSECK, P.A.**
25 West Flagler Street, Suite 800
Miami, FL 33130
Telephone: (305) 358-2800
Fax: (305) 358-2382
Attorneys for Plaintiffs

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on July 26, 2013, on all counsel or parties of record on the Service List below.

/s/ Steven C. Marks

## SERVICE LIST

| | |
|---|---|
| Lyndall Lambert, Esq.<br>Email: lyndall.lambert@hklaw.com<br>**Holland & Knight LLP**<br>701 Brickell Avenue, Suite 3000<br>Miami, FL 33131<br>Telephone: (305) 374-8500<br>Facsimile: (305) 789-7799 | Christopher G. Kelly, Esq.<br>Email: christopher.kelly@hklaw.com<br>Sarah G. Passeri, Esq.<br>Email sarah.passeri@hklaw.com<br>**Holland & Knight LLP**<br>31 West 52nd Street<br>New York, NY 10019<br>Telephone: (212) 513-3264 |
| *Attorneys for Defendant, Delta Air Lines, Inc.* | *Attorneys for Defendant, Delta Air Lines, Inc.* |